**David OSHER, on behalf of himself and all others similarly situated, Plaintiff,**

v.

**JNI CORPORATION, et al., Defendants.**

**No. CIV.01–CV–557–J(NLS).**

United States District Court, S.D. California.

March 26, 2003.

---

William S Lerach, Spencer Alan Burkholz, Milberg Weiss Bershad Hynes and Lerach, San Diego, CA, Andrew L Barroway, Schiffrin and Barroway, Bala Cynwyd, PA, for David Osher, Pond Equities, Brian Horne, Gregory Dew, Aharon Krozier, Andrew Daron William Mahrdt, Marco Carnevale, Andrew Tarica, Westland Police & Fire Retirement System.

Francis Michael Gregorek, Wolf Haldenstein Adler Freeman and Herz, San Diego, Ca, for David Ford.

Leigh A Parker, Weiss and Yourman, Los Angeles, CA, for William Sobeck, Ed Edmund, Tod Ketcham, Jianmin Li, Sigmund Self, Steven Urow.

Robert W Brownlie, Gray Cary Ware and Freidenrich, San Diego, CA, for JNI Corporation, Terry Flanagan, Gloria Purdy, Thomas K Gregory, Charles McKnett, Scott Ruple, Eric P Wenaas.

## ORDER GRANTING MOTION TO DISMISS [Doc. No. 66] ORDER DENYING MOTION TO STRIKE [Doc. No 71]

JONES, District Judge.

This matter comes before the court on defendants' motion to dismiss and defendants' motion to strike. For the reasons stated herein, defendants' motion to dismiss is granted, and the motion to strike is denied as moot.

### I. *Background*

#### A. Factual History

Plaintiffs represent a class of all purchasers of common stock of JNI Corporation ("JNI") between July 13, 2000 and March 28, 2001 (the "class period"). First Am. Consolidated Compl. ("FACC") ¶ 1. Plaintiffs allege that JNI's officers and directors conspired to artificially inflate the price of JNI stock during the class period so they could sell off their personal holdings of JNI stock at inflated prices.

JNI designs and supplies Fibre Channel hardware and software products that connect computer servers and data storage devices to form storage area networks ("SANs"). *Id.* ¶ 2. Fibre Channel technol-

ogy improves data communication speeds, connectivity, distance between connections, reliability and accessibility. *Id.* ¶ 2. JNI markets a broad range of Fibre Channel host bus adapters and software products that facilitate advanced SAN device integration and management. *Id.*

JNI had its initial public offering ("IPO") in October 1999, at which time its stock was priced at $19 per share. *Id.* ¶ 32. Following the IPO, sixty percent of JNI's stock was held by a parent company called Jaymark, Inc. ("Jaymark"). *Id.* Defendant Eric P. Wenaas was CEO and President of Jaymark. *Id.* ¶ 23(e).

By summer of 2000, JNI's stock was trading for about $25 per share, down from a prior range of $80–$100 per share. *Id.* ¶¶ 3, 32. Around this time, plaintiffs allege defendants "devised a scheme to artificially inflate JNI's stock price and distribute their shares in a Secondary Offering." *Id.* ¶¶ 3, 29. On July 24, 2000, Jaymark reorganized and distributed all its JNI stock to Jaymark's shareholders, including defendants Wenaas, Terry M. Flanagan, Thomas K. Gregory, Charles McKnett, and John Stiska. *Id.* ¶¶ 3, 37. Pursuant to lock-up agreements, defendants were limited in the amount of JNI stock they could sell for 180–360 days following Jaymark's reorganization, except in the case of a public offering. *Id.* ¶¶ 3, 32, 37. In the weeks prior to Jaymark's reorganization, plaintiffs claim defendants made false and misleading statements in the form of press releases and statements to analysts. *Id.* ¶¶ 33–36, 39.

On October 19, 2000, JNI issued its Secondary Offering at the price of $74 per share. *Id.* ¶ 45. The Secondary Offering provided net proceeds of $69 million to JNI and $245 million to Jaymark's shareholders, including $32 million to the individual defendants. *Id.* ¶ 4. Around the time of the Secondary Offering, plaintiffs claim defendants made a number of false

and misleading statements designed to inflate the price of JNI stock. *Id.* ¶ 3. These statements were made: (1) during a roadshow in early October 2000, prior to the offering; (2) in a press release dated October 16, 2000, in which defendants announced JNI's results for third quarter 2000; (3) during a conference call with analysts and investors on October 16, 2000; and (4) in JNI's prospectus issued on October 20, 2000 in connection with the offering. *Id.* ¶¶ 3–4, 11, 41–42, 44. As a result of defendants' allegedly false and misleading statements, a number of analysts issued extremely favorable reports on JNI and raised their earning estimates for JNI for the upcoming quarter and fiscal year. *Id.* ¶ 11. JNI's stock price peaked at $126 per share on November 6, 2000. *Id.* ¶¶ 16, 51.

After the Secondary Offering and throughout the remainder of the class period, plaintiffs claim defendants continued to make false and misleading statements about JNI's performance and prospects. In November 2000, after unfavorable reports about JNI appeared in the media and JNI's stock's dropped to $63 per share, JNI made statements in a press release and during a conference call which plaintiffs claim were false or misleading. *Id.* ¶¶ 12, 53–60. On December 11, 2000, JNI announced a lower-than-expected range of growth for fourth quarter 2000, causing JNI's stock to drop to $34–3/4 per share. *Id.* ¶ 13. Plaintiffs claim this announcement was misleading because JNI failed to disclose that results for fiscal year 2001 would also be "significantly lower" than expected. *Id.* ¶ 14. On January 24, 2001, JNI reported its fourth quarter 2000 revenues and lowered its projections for fiscal year 2001, causing JNI's stock price to drop further to $20.06 per share. *Id.* ¶ 15. Plaintiffs claim this announcement was misleading because defendants projected a strong second half for fiscal year

2001 and used accounting manipulations to inflate the reported results. *Id.* Finally, on March 28, 2001, JNI revised its forecast for first quarter 2001 downward and announced that revenues and earnings per share for fiscal year 2001 would be less than projected. *Id.* ¶¶ 16, 74. Following this announcement, JNI's stock dropped to $7–3/8 per share, and was still trading at less than $10 per share at the time the complaint was filed. *Id.* ¶ 16.

## B. Procedural History

In April 2001, six nearly-identical securities fraud actions were filed in this district against JNI and its officers and directors. Defendants answered and moved to dismiss each of the six complaints. In an order dated July 10, 2001, this court removed defendants' motions to dismiss from calendar while plaintiffs' motions to consolidate and appoint lead plaintiffs were pending. *See* Order of July 10, 2001, Doc. No. 36. The court subsequently consolidated the six related actions, appointed lead plaintiffs, and ordered lead plaintiffs to file an amended consolidated complaint. *See* Order of Feb. 8, 2002, Doc. No. 53; Order of Feb. 21, 2002, Doc. No. 61.

On March 25, 2002 plaintiffs filed the FACC. Named as defendants are JNI; former President and Chief Executive Officer Terry Flanagan; Chief Financial Officer Gloria Purdy; Chief Operating Officer Thomas Gregory; Chief Technology Officer Charles McKnett; JNI Chairman and Jaymark CEO Eric Wenaas; and JNI director John Stiska. *Id.* ¶¶ 22–23. The FACC alleges five claims for relief: (1) violation of § 10(b) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b–5 against all defendants; (2) violation of § 20(a) of the 1934 Act against Flanagan, Purdy and Wenaas; (3) violation of § 11 of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. § 77k, against JNI, Flanagan, Purdy, Wenaas, and Stiska; (4) violation of § 12(a)(2) of the 1933 Act against

all defendants; and (5) violation of § 15 of the 1933 act against Wenaas, Flanagan and Purdy.

On April 29, 2002, defendants filed the present motion to dismiss the FACC for failure to meet the heightened pleading requirements of the Private Securities Litigation Reform Act (PSLRA). Alternatively, defendants moved to strike the FACC, on the grounds that it asserts unauthorized claims by an unauthorized group of lead plaintiffs.

## II. *Analysis*

A motion to dismiss for failure to state a claim tests the legal sufficiency of the complaint. *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir.2001). In ruling on a motion to dismiss, the court must take the complaint's allegations as true and draw all reasonable inferences in plaintiffs' favor. *See id.* Dismissal is appropriate only if there is no cognizable legal theory or if the complaint fails to allege sufficient facts to support a cognizable legal theory. *See id.*

■ Complaints in securities fraud actions, however, are subject to heightened pleading standards under Federal Rule of Civil Procedure 9(b) and the PSLRA. Failure to meet these heightened pleading requirements is cause for dismissal of the complaint. *See* 15 U.S.C. § 78u–4(b)(3)(A). Under Rule 9(b), a complaint alleging fraud must state the circumstances constituting the fraud "with particularity." Fed.R.Civ.P. 9(b). This means the complaint must specify the time, place, and content of any false or misleading statements and explain why the statements were false or misleading when made. *See Anderson v. Clow (In re Stac Elec. Sec. Litig.)*, 89 F.3d 1399, 1404 (9th Cir.1996).

■ The PSLRA augments Rule 9(b), requiring a securities fraud complaint to

"specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, [to] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1); *see Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022–23 (9th Cir.2000) (discussing combined requirements of Rule 9(b) and PSLRA); *In re Autodesk, Inc. Sec. Litig.*, 132 F.Supp.2d 833, 839 (N.D.Cal.2000) (same). Further, where scienter is an element of the claim, the PSLRA requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). This means that the complaint must allege specific and detailed facts which raise a strong inference that the defendant acted intentionally or with deliberate recklessness. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974–75 (9th Cir.1999). The court reviews the entire complaint to determine whether the totality of facts and inferences, including inferences unfavorable to the plaintiffs, raise a strong inference of scienter. *See Gompper v. VISX, Inc.*, 298 F.3d 893, 896–97 (9th Cir.2002).

### A. Alleged False and Misleading Statements

#### 1. *July 2000 Statements*

Plaintiffs allege that sometime in summer of 2000, defendants devised their scheme to artificially inflate JNI's stock and sell their personal holdings at inflated prices in a public offering. Plaintiffs purport to identify several false or misleading statements defendants made in July 2000 in furtherance of this scheme. First, plaintiffs allege that on July 12, 2000, "JNI announced a certification agreement with Compaq, an OEM [original equipment manufacturer], to supply JNI's products to customers." FACC ¶ 33. Second, plaintiffs block quote three paragraphs of a July 17, 2000 press release in which JNI reported "record" results for second quarter 2000 and announced long-term agreements with several OEMs. *See id.* ¶ 34. Third, plaintiffs block quote two reports from analysts, dated July 18, 2000, which were allegedly based on information provided by defendants Purdy and Flanagan. *See id.* ¶¶ 35–36. Certain sections of the quoted reports are boldfaced, apparently reflecting plaintiffs' belief that those sections are false or misleading.

Plaintiffs claim these statements were false for two reasons. First, "[a]ccording to former JNI employees, Sun employees were informing JNI employees in the summer of 2000 that demand for JNI's Sun-based products would be declining." *Id.* ¶ 39(a). Second, "JNI was not making the transition from Sun-based products to PCI products" because "it was having difficulty developing PCI products that would be accepted by the market." *Id.* ¶ 39(b).

■ These allegations, however, do not establish that any of the identified statements are false or misleading. Regarding the first statement, none of the facts alleged by plaintiffs contradict JNI's representation that it entered into a certification agreement with Compaq. Moreover, plaintiffs' description of the July 12, 2000 announcement is inadequate under Rule 9(b) and the PSLRA because plaintiffs do not specify where, by whom, or under what circumstances it was made.

■ As to the remaining statements, the court is left to speculate which portions of the block-quoted passages are alleged to be false or misleading. *See Autodesk*, 132 F.Supp.2d at 841–42 (criticizing plaintiffs' pleading technique of providing a long list of allegedly false statements, followed by a long list of reasons the statements are false, leaving the court to "match the

statements up with the reasons they are false or misleading"). With respect to the July 17, 2000 press release, the court assumes plaintiffs take issue with defendant Flanagan's representations that there was "continued strong demand" for JNI's products and that JNI "dominated" the market. The press release quotes defendant Flanagan as saying that the second quarter results reflect "continued strong demand for [JNI's] Unix and PC suite of products"; that JNI's host bus adapters ("HBAs") "continue to dominate in the Fibre Channel storage area network sector at the high-end of the market"; and that JNI's sales of PCI-based HBAs "validate[ ] our position as a dominant supplier in the Solaris and Unix market." *Id.* ¶ 34.

However, none of the "true facts" alleged by plaintiffs in ¶ 39 demonstrates that this press release was false or misleading. Even if Sun employees were informing JNI employees that demand for JNI's Sun-based products would be declining, plaintiffs do not specify the severity or time frame of the alleged decline. A slight to moderate decline might not necessarily undermine JNI's "dominant" position in the market or the "continued strong demand" for its products. The complaint does not "describe, chart or graph" the alleged decline in demand. *See Ronconi v. Larkin,* 253 F.3d 423, 431 (9th Cir.2001). Moreover, the complaint does not allege facts demonstrating that defendants knew of the Sun employees' predictions on the date of the press release,[1] or that the predictions of these unidentified Sun employees were so reliable that they should have been credited by the defendants.

■ Furthermore, plaintiffs' allegation that "JNI was not making the transition from Sun-based products to PCI products" is too vague to demonstrate that the press

release was false. The complaint does not explain what it means to "make the transition" to PCI products, nor does it set forth facts corroborating the allegation that JNI "was having difficulty developing PCI products that would be accepted by the market." *Cf. Ronconi,* 253 F.3d at 434 (general allegations of "problems" and "difficulties" were insufficient to show that defendants' representations of increasing revenue were false). Specifically, plaintiffs do not indicate what about JNI's PCI products made them unacceptable to the market or explain why these vague "difficulties" with the PCI products rendered defendants' statements false.

■ Finally, regarding the analyst reports, plaintiffs' allegations establish neither the falsity of the reports nor the defendants' liability for those reports. The majority of the block-quoted passages merely report historical facts, such as JNI's past rates of sequential growth, that are not contradicted by plaintiffs' alleged "true facts." *See* FACC ¶¶ 35–36. Moreover, it is clear from the wording of the highlighted statements that the predictions and estimates are those of the analysts, not the defendants. *See, e.g., id.* ¶ 35 ("*We* are raising *our* revenue and earnings outlook owing to *our* optimism in JNI . . .")(emphasis added).

■ An insider defendant can be liable for analysts' reports if the defendant either (1) makes false or misleading statements to analysts "with the intent that the analysts communicate those statements to the market," *Cooper v. Pickett,* 137 F.3d 616, 624 (9th Cir.1997); or (2) puts his or her imprimatur on the analysts' statements, *Rosenbaum v. Syntex Corp. (In re Syntex Corp. Sec. Litig.),* 95 F.3d 922 (9th

---

1. Indeed, another section of the complaint suggests that Sun employees did not begin informing JNI employees of the decline in demand for JNI products until August 2000, *after* the date of this press release. *See* FACC ¶ 47(c).

Cir.1996). Plaintiffs argue that defendants are liable under the first theory. However, even under the first theory, plaintiffs' allegations fall short of the PSLRA's requirements. Plaintiffs do not identify the substance of the false or misleading statements or plead any corroborating details indicating how, when, and under what circumstances the statements were communicated to the analysts. *Cf. In re Secure Computing Corp. Sec. Litig.*, 184 F.Supp.2d 980, 990 (N.D.Cal.2001) (plaintiffs adequately pled liability for analyst report under *Cooper* theory by identifying defendant's false statement to analysts and specific time and place it was made). Rather, plaintiffs allege only that the analysts' reports were "based on information provided by defendants, including Purdy and Flanagan," *see* FACC ¶¶ 35–36, which is inadequate under the PSLRA.

### 2. October 2000 statements

Plaintiffs further claim that defendants made a number of false statements in October 2000 to artificially inflate JNI's stock prices prior to the October 19, 2000 Secondary Offering. These statements were made (1) during a roadshow to promote the Offering in early October, (2) in an October 16, 2000 press release announcing JNI's third quarter results, (3) during an October 16, 2000 conference call with investors, analysts and media representatives, and (4) in JNI's prospectus issued October 20, 2000, in connection with the Offering. *See* FACC ¶¶ 41–46. Again, plaintiffs utilize the technique of providing a long list alleged false statements, including some block quotes, followed by an equally long list of reasons the statements were false or misleading. The court is left to speculate in matching each statement with the purported reason it is false or misleading.

### a. Roadshow and prospectus allegations

■ Plaintiffs allege that as part of the "roadshow," "defendants" traveled to Europe the week of October 2–6, 2000, traveled in the United States the week of October 9–13, and met with institutional investors and money and portfolio managers on October 16–19. *Id.* ¶ 44. During the roadshow, "defendants" made "very favorable presentations" about JNI, failed to disclose adverse facts, and represented that JNI's business was "strong" and would be showing significant sequential growth. These vague allegations are inadequate to plead falsity or scienter under Rule 9(b) and the PSLRA, as plaintiffs do not identify the alleged false statements, who made them, or where or when they were made.

■ In addition, plaintiffs quote extensively from JNI's October 20, 2000 prospectus. *Id.* ¶ 46. The quoted passage summarizes JNI's results for third quarter 2000, gives technical descriptions of JNI's products, and describes JNI's strategy for the future. Plaintiffs do not specify, nor can the court guess, which statements in this page-long, single-spaced block quote are alleged to be false or misleading. Thus, plaintiffs have failed to satisfy the PSLRA's requirement that they "specify each statement alleged to have been misleading" with respect to the Registration Statement and Prospectus.

### b. October 16, 2000 Press Release and Conference Call

On October 16, 2000, defendants issued a press release reporting "record" third quarter results. FACC ¶ 41. Plaintiffs block quote several paragraphs of the press release but do not specifically identify the portions alleged to be false or misleading. For the most part, the press release reports factual data, such as per-

centage increases in sales of certain products. However, it also quotes Flanagan as saying JNI "achieved another sequentially strong quarter, reflecting continued strong demand" for JNI products, and that "we expect continued expansion in revenues" from the FibreStar PCI HBA product group. *Id.* The court assumes these are the statements alleged to be misleading.

 Also on October 16, 2000, JNI hosted a conference call for investors, analysts and media representatives, during which defendants Flanagan and Purdy allegedly made false and misleading statements. *Id.* ¶ 42. According to plaintiffs, Flanagan and Purdy stated "[d]uring the call and in follow-up conversations" that:

1. JNI was "continu[ing] to grow in all product lines";

2. JNI "looked forward with confidence" and was "well positioned with strong OEM, distribution, and channel relationships";

3. JNI was "leveraging its current technology to develop new products";

4. revenue would have been higher but for some component shortages, which were no longer a problem;

5. industry growth rates were similar to last year, which was higher than 60%;

6. PCI sales were down slightly but newer products "would be certified by the distribution channel," making fourth quarter 2000 a "big quarter for JNI";

7. the European market was "strong" and European sales would grow at the same rate as U.S. sales;

8. JNI expected the PCI Emerald product to be approved by the OEMs in fourth quarter 2000;

9. increased inventory levels were not a concern because JNI expected to sell a high volume of PCI products in fourth quarter 2000.

*Id.*[2]

Initially, the court notes that these allegations are problematic because they do not identify the precise statements, who said them, and when each statement was made. Rather, plaintiffs paraphrase the alleged misleading statements, attribute each statement to either Flanagan or Purdy (or both), and allege each statement was made either during the conference call itself or during a "follow-up" call.

Assuming *arguendo* that plaintiffs' allegations regarding the conference call are sufficiently specific under the PSLRA, plaintiffs must still plead facts demonstrating that the statements were false or misleading. Plaintiffs offer several reasons for their belief that the statements were false. First, according to plaintiffs, defendants Flanagan, Purdy and Gregory ran meetings every Tuesday known as "Green Sheet Meetings," which were attended by "JNI's executives, including all vice-presidents and senior vice-presidents, and the Company's operations, sales and engineering employees." *Id.* ¶ 47(a). At each meeting, two reports were handed out. One report broke down sales by individual product, customer, month, and projected sales into the future for production purposes. *Id.* The other report "contained current financial data such as revenue, net income, and burn rate." *Id.* In addition, at

---

**2.** Plaintiffs also block-quote two analyst reports issued after the conference call. *See* FACC ¶¶ 48–49. However, as discussed above, under the *Cooper* theory of liability for analyst reports, defendants are liable not for the analyst's statements, but for their own statements made to analysts. *See Cooper,* 137 F.3d at 624. Thus, defendants can only be liable for the analysts' reports to the extent that defendants' own statements were false or misleading.

each meeting, the sales force gave a status report on every sales account, including projected shortfalls. *Id.*

According to "former top executives who attended these weekly meetings," a "huge dispute" arose between defendant Purdy and members of the JNI sales team "at or around the time of the third quarter results and prior to the completion of the Secondary Offering." *Id.* ¶ 47(b). Members of the sales team reported a "significant" decrease in demand for JNI's products, and had firsthand knowledge of this because they "dealt directly with OEMs, channel partners, and end-use customers." *Id.* ¶ 47(c). Apparently, JNI's biggest customer, EMC, which accounted for 60–75% of sales, "was not requesting as many orders as projected." *Id.* Moreover, "the sales team was not closing any large sales and was failing to expand JNI's customer base." *Id.* Based on this "negative information," the sales team "felt that JNI should go public and announce that they would not meet earnings expectations," but defendant Purdy was "vehemently opposed" to this. *Id.* ¶ 47(e).

According to plaintiffs, other adverse information also came to light at the weekly Green Sheet meetings. At some unspecified time, JNI employees were "warned that end demand for JNI products was softening in both the United States and Europe." Also, in August 2000, Sun Microsystem employees told JNI engineering employees that demand for JNI products would be "declining." *Id.* ¶ 47(c). One former employee remembered an announcement at "one of the October weekly meetings" that demand for new orders was decreasing because he was responsible for ordering materials used to make JNI's products three to four months in advance. As a result of the announcement, the employee cancelled purchase orders from parts suppliers for the months of December 2000 and January 2001. *Id.* ¶ 47(d).

Furthermore, plaintiffs claim it was "clear" from data contained in the October Green Sheet reports that total revenue for third quarter 2000 "would be flat sequentially," and that "revenue in the first quarter of 2001 was not going to be as high as forecasted." *Id.* ¶¶ 47(b), (e).

Although plaintiffs' allegations about the Green Sheet meetings do contain some important details, they are deficient in several respects. First, plaintiffs neither establish that the defendants were present at the meetings when these adverse facts were discussed, nor indicate if, how, and when the defendants obtained the information discussed or disseminated at the meetings. Although it is alleged that Flanagan, Purdy and Gregory generally ran the meetings, that does not necessarily mean that each of these individuals was present at every meeting.

More significantly, plaintiffs do not describe with any particularity the alleged decrease in demand that was reflected in the reports and discussed at the meetings. Although plaintiffs contend that the October data reflected a "significant" decrease in demand and that sales were "declining" and "softening," they do not "describe, chart or graph" the alleged decline. *Ronconi,* 253 F.3d at 431; *cf. In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1086–87 (9th Cir.2002) (finding fault under the PSLRA with plaintiffs' failure to define terms such as "substantial," "sufficient numbers," "extremely strong," etc.). The absence of such details undermines plaintiffs' allegations. For instance, plaintiffs claim that Purdy and the sales team got into a "huge dispute" because Purdy did not want to disclose what the sales team believed to be a "significant" decrease in demand. Without any details about the "significance" of the decrease in demand, it is difficult to evaluate whether Purdy's position was unreasonable or in bad faith.

In addition, plaintiffs allege that JNI's biggest customer was "not requesting as many orders as projected," but plaintiffs do not indicate how many orders were projected, by what amount the actual orders fell short of the projections, or who made the projections. Similarly, plaintiffs allege the sales team wanted to go public and announce that JNI would not meet earnings expectations, but they do not indicate the source of the estimates or when, by whom, and under what circumstances the estimates were announced to investors, if at all. Without these details, plaintiffs cannot raise a strong inference that Purdy *knew* that JNI's business was worse than she publicly represented.

Plaintiffs' allegation about the former employee who cancelled orders comes closer to alleging falsity and scienter, but is still insufficient to raise a "strong inference." Although plaintiffs allege an "announcement" at "one of the October weekly meetings," they do not indicate at which October meeting the announcement was made. This is a significant detail because the alleged false statements occurred on October 16, 2000, such that the probative value of the announcement would vary depending on whether it was made before or after that date. Plaintiffs also do not indicate who made the announcement or how plaintiffs know each defendant knew about it.

██ Another reason plaintiffs contend the October 16, 2000 statements were false is that JNI was allegedly losing business to a competitor, Emulex. *Id.* ¶ 47(f). Competition from Emulex was a "major concern" and a frequent topic of conversation at the weekly meetings. Plaintiffs allege that an internal email from August 2000 indicates that Flanagan conducted "secret meetings" with Emulex's Chief Executive Officer to discuss the sale of JNI to Emulex. *Id.* ¶ 47(g).

██ Emulex, however, is not mentioned in any of the statements alleged to be false or misleading. Thus, plaintiffs must be contending that JNI's failure to disclose the "secret meetings" with Emulex was somehow misleading. An omission is only actionable if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir.2002). Here, the alleged omissions do not meet this standard. Specifically, none of the statements affirmatively creates an impression that JNI did not have competition from Emulex. Similarly, none of the challenged statements creates any impressions whatsoever about the possible sale of JNI to Emulex.

██ Plaintiffs also allege that the statements were false because, around the time of the offering, one of JNI's "major" OEM customers, Hitachi, was not endorsing JNI's products. *Id.* ¶ 47(h). Apparently Hitachi issued a directive not to purchase JNI's PCI cards because JNI's competitor, Hewlett Packard ("HP"), told Hitachi that JNI had used HP-proprietary data in JNI's products. *Id.* Plaintiffs allege that internal emails demonstrate that defendants were aware of this issue with Hitachi around the time of the offering. Specifically, one week prior to the offering, Wenaas sent an email to "other defendants" setting forth the problem. *Id.* Later, "days prior to the Offering being closed," Flanagan wrote an email to Wenaas regarding Hitachi's directive not to purchase JNI's products. *Id.* Plaintiffs further contend, without any supporting details, that defendants discussed, but decided against, disclosing the Hitachi–HP issue in the Prospectus or in an Amendment because of the potential negative impact it might have on the Offering. *Id.*

This problem with Hitachi does not necessarily establish that any of defendants' statements were false or misleading. Plaintiffs themselves confirm that JNI had business relationships with numerous OEMs, channel partners and end-users. See FACC ¶ 47(c). Thus, even if Hitachi was refusing to endorse JNI's products and defendants knew about it, plaintiffs have not pled facts indicating that this problem would necessarily result in losses for JNI. More importantly, plaintiffs have not explained why defendants should have known on October 16, 2000 that the Hitachi problem would cause losses.

■ Further, plaintiffs contend that defendants' statements were false because JNI "was not making a smooth transition from Sun-based products to PCI products" and "was not obtaining enough OEM certifications of its PCI products." Id. ¶ 47(i). The press release and conference call statements discuss JNI's expectation of increased development and sales of PCI products. For instance, the October 16, 2000 press release indicates that "we expect continued expansion in revenues from [the PCI] product group." Id. ¶ 41. In addition, during the conference call, Flanagan and Purdy allegedly stated that JNI expected its PCI products to be "approved" and/or "certified" in fourth quarter 2000.

As discussed above, plaintiffs' allegations regarding JNI's development of PCI products are too vague to be useful. For instance, the complaint does not explain the significance of obtaining OEM certifications, and does not indicate how many OEM certifications would be "enough" to effect a "smooth transition" to PCI products. Moreover, even if JNI was having "difficulties" developing its PCI products, plaintiffs do not allege facts demonstrating that these difficulties were so severe that defendants knew on October 16, 2000 that the products would not be accepted or

certified some time during fourth quarter 2000. Cf. In re Stratosphere Corp. Sec. Litig., 1 F.Supp.2d 1096, 1113–14 (D.Nev. 1998) (allegations that defendants knew of cost overruns on construction project were insufficient to demonstrate that defendants also knew construction project would ultimately fail).

■ Finally, plaintiffs allege that some time in "late October 2000," defendant Purdy wrote an email to "other defendants" stating "Here's the issue—this quarter is not looking so great—Sxxx." Id. ¶ 50. This allegation does raise an inference that Purdy knew sometime in "late October 2000" that the fourth quarter 2000 was "not looking so great." Plaintiffs do not specify, however, which other defendants received the email. Moreover, the email falls short of raising a strong inference that Purdy uttered false statements with scienter for several reasons. First, plaintiffs do not specify when the email was sent. Purdy allegedly made false statements during the conference call on October 16, 2000. It seems, however, that the "Sxxx" email was circulated after the alleged false statements. Thus, the email does not necessarily establish that the fourth quarter was "not looking so great" on October 16, 2000. Cf. Yourish v. Cal. Amplifier, 191 F.3d 983, 997 (9th Cir. 1999) (temporal proximity of alleged false statement to subsequent disclosure does not necessarily raise strong inference that statement was false when made); but cf. Stratosphere, 1 F.Supp.2d at 1112 ("The shortness of time between later revealed truth and prior statements can be circumstantial evidence that the optimistic statements were false or misleading when made.").

Furthermore, plaintiffs have failed to identify specific statements made by Purdy in October 2000 that are contrary to the "Sxxx" email. As discussed above, plain-

tiffs' allegations about the roadshow and the prospectus are inadequate. Moreover, assuming that Purdy is responsible for the October 16 press release, none of the information in that press release is contrary to Purdy's subsequent email. With respect to the conference call, Purdy's email does not contradict any of Purdy's or Flanagan's alleged statements, except perhaps the statements that "JNI looked forward with confidence," "Q400 would be a big quarter for JNI," and "JNI was expecting to sell high volume of PCI products." These statements, however, appear to be projections or forward-looking statements.

The PSLRA provides a "safe harbor" which exempts from liability "forward-looking statements" unless the statement is "made with actual knowledge ... that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(B)(i). A "forward-looking statement" is a statement that contains a projection of revenues, describes future plans or objectives of management, or predicts future economic performance. *See id.* § 78u–5(i)(1). Statements about defendants' expectations that JNI would expand its revenues from PCI products fall into this category. Thus, plaintiffs must allege facts raising a strong inference that Purdy actually knew the October 16, 2000 statements were false when made. Because Purdy wrote the "Sxxx" email in "late October," it does not establish that she actually knew on October 16, 2000 that the fourth quarter was "not looking so great."

### 3. November 2000 Statements

On November 9, 2000, JNI filed its Form 10–Q for the quarter ending September 30, 2000. *Id.* ¶ 52. The 10–Q stated that JNI had historically derived most of its revenue from its "FibreStar host bus adapters designed for the SBus specification" and used by Sun Microsystems in manufacturing its products. *Id.* Further, the 10–Q disclosed JNI's belief that Sun had begun to "phase out the SBus interface in its workstations and low-end servers and may in the future discontinue using the SBus interface in its high-end servers." Accordingly, JNI expected that sales of SBus products would "eventually decline," and sales of its PCI products would "account for an increasing proportion of revenues in the future." *Id.*

The 10–Q also reported JNI's third quarter 2000 revenues, and explained that the increase "reflects the increased demand for our products and the continued growth in the market for Fibre Channel products." *Id.* Finally, the 10–Q reported that defendant Flanagan was planning to retire from his position as CEO, but would "provide consulting services to us for a period of twelve months following his retirement."

On November 10, 2000, several unfavorable reports about JNI appeared in the media. One article on *TheStreet.com* questioned JNI's business prospects and suggested that JNI would be edged out by its competitors. *See id.* ¶ 53. Two other articles, which appeared in the *Dow Jones Newswire,* bore the headlines: "JNI Corp. Down 9%; CEO wants to retire"; "JNI Corp. 'Actively Engaged' in Replacing CEO Flanagan"; and "JNI Corp. Frets Over Revenue Tied to Sun Micro Product." *Id.* ¶ 54. That same day, JNI's stock price dropped to $70, when trading was halted at JNI's request. *Id.* ¶¶ 44, 59.

JNI promptly responded to these reports. In a press released issued November 10, 2000, JNI confirmed Sun's intention to move from SBus servers to PCI servers, but stated that Sun had never "officially announced an end-of-life date" for SBus servers. The press release also stated that SBus sales had actually grown in the past quarter. *Id.* ¶ 57. Plaintiffs also allege (without specifying the time and place) that Purdy said that JNI con-

tinued to have strong shipments of SBus products, and that Flanagan's retirement had been disclosed previously. *Id.* ¶ 58.

In addition, on November 13, 2000, JNI issued a prepared statement for a conference call stating: (1) that it disagreed with the article on *TheStreet.com;* (2) that the information portrayed as news in the *Dow Jones* articles—Flanagan's departure and Sun's phasing-out of SBus products—had already been disclosed, and (3) that *Dow Jones* had issued a correction to its articles. *Id.* ¶ 59. Flanagan then made statements indicating that his retirement had been previously disclosed, that he planned to serve as a member of JNI's Board of Directors, and that Sun's intention to eventually phase out SBus had been previously disclosed. Flanagan emphasized current SBus sales figures and stated that, based on "all indications in the market today," SBus was "strong and growing." Flanagan further commented that JNI intended to "eventually migrate from SBus to PCI bus as the market dictates." *Id.* At some point, in response to an analyst's question, "defendants" stated that it was "just business as usual at JNI." *Id.*

▮ Plaintiffs allege that these statements were false and misleading for the reasons discussed above and because "JNI was not seeing continued strong shipment of Sun-based products and in fact, the entire business was deteriorating." *Id.* ¶ 60(a). The difficulty with this allegation, once again, is that plaintiffs do not back up the allegation with any data or figures. Defendants supported their statements about "strong" sales and shipments of SBus products with representations that SBus sales had increased 32% from the previous quarter. Plaintiffs do not plead any specific facts indicating this representation was false.

▮ Plaintiffs also contend that "defendants knew Flanagan was not going to remain at JNI" and that they were "nego-tiating an exit package with Flanagan that included his departure from the Board." *Id.* ¶ 60(b). On November 27, 2000, JNI announced the appointment of a new CEO. *Id.* ¶ 61. Shortly thereafter, on February 6, 2001, Flanagan announced his resignation from the Board of Directors. *Id.* ¶ 72. Based on just these facts, plaintiffs contend defendants' prior representations that Flanagan would serve on the Board of Directors for another year were false. *See id.* ¶ 62. However, plaintiffs do not explain why they believe defendants knew in early November 2000 that Flanagan "was not going to remain at JNI." If plaintiffs allege false or misleading statements on information and belief, the PSLRA requires them to "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4. Because plaintiffs have not done that, they have not established that defendants' statements about Flanagan were false or misleading.

Plaintiffs also contend that sometime in November 2000, defendants terminated JNI's head of Research and Development "blaming him for not meeting targets in the development of JNI's PCI products." *Id.* ¶ 60(c). However, plaintiffs do not explain how this fact renders defendants' statements on November 9 through 13, 2000 false or misleading. The substance of those statements was that JNI planned to "migrate" from SBus products to PCI products, and that JNI expected PCI products to eventually account for more of its revenues. JNI's firing of the head of Research and Development is not inconsistent with those statements. Moreover, plaintiffs do not explain the basis for their belief that this individual was fired for the reasons alleged.

Finally, plaintiffs continue to insist that based on reports from Green Sheet meetings, defendants knew JNI would not meet earnings estimates for fourth quarter 2000

and fiscal year 2001 "as previously represented to investors." However, the court is unable to locate any statement in November 2000 in which defendants purported to project earnings or future revenues.

### 4. December 2000 and January 2001 Statements

■ On December 11, 2000, JNI issued a press release "pre-announcing" its expected results for fourth quarter 2000 and fiscal year 2000. *Id.* ¶ 63. Defendant Purdy was quoted as saying JNI was "optimistic" and "expect[ed] earnings per share to range between $0.18 and $0.22." Nevertheless, these results apparently fell short of analysts' expectations of 18–20% sequential growth. *Id.* ¶ 64. After this announcement, JNI's stock price dropped to $34–3/4 per share in high volume trading. *Id.*

Plaintiffs claim these statements were "not a full disclosure of JNI's business problems" because defendants did not disclose that: (1) fiscal year 2001 results would be "significantly lower than estimates"; (2) JNI was failing to obtain OEM certificates for "key" PCI products; and (3) JNI was "accumulating excess inventory due to the continued deterioration of its business." *Id.* ¶ 68.

None of these facts establish that JNI's December 11, 2000 press release was false or misleading. Plaintiffs do not allege, for instance, that the figures reported by Purdy were false. Moreover, their allegation that fiscal year 2001 results would be "significantly lower than estimates" is inadequate because plaintiffs do not explain the source of the "estimates." If plaintiffs are referring to the analysts' estimates, they have not alleged sufficient facts to demonstrate that defendants are responsible for the analysts' estimates.

■ Moreover, the press release was not misleading merely because it failed to disclose certain adverse facts. As noted above, the securities laws prohibit only false and misleading statements, not incomplete statements. *See Brody,* 280 F.3d at 1006. Here, plaintiffs allege that defendants failed to disclose adverse facts about the results for fiscal year 2001, lack of OEM certifications on PCI products, and accumulating inventory. The press release, however, does not implicitly or explicitly address any of these topics, so it does not create an "affirmative impression" contrary to the "true" state of affairs alleged by plaintiffs.[3]

■ On January 24, 2001, JNI issued another press release reporting its results for fourth quarter 2000 and fiscal year 2000. FACC ¶ 59. The press release describes revenues, earnings per share, and sequential growth rates. Plaintiffs also allege that JNI "disclosed that it was reducing FY01 estimates due to weakness in the Sun-based market and a lack of OEM certifications but still expected strong second half growth for FY01." *Id.* ¶¶ 15, 70.

Plaintiffs claim this disclosure was misleading because defendants "continued to project a strong second half for FY01 and defendants also failed to disclose that these results were inflated by accounting manipulations." *Id.* ¶ 15. Specifically, plaintiffs claim JNI should have "taken a write down" of approximately $7.7 million based on excess inventory in fourth quarter 2000, and that JNI's failure to do so was a violation of Generally Accepted Accounting Principles ("GAAP"). *See id.* ¶¶ 15, 70. However, according to plaintiffs, Purdy insisted that the write-down be delayed until a later quarter. *Id.* ¶¶ 15,

---

**3.** Plaintiffs also block quote extensively from reports issued by analysts following the December 11, 2000 press release. *See id.* ¶¶ 65–

67. They do not, however, explain how defendants are in any way liable for these reports.

71. The write-down was finally announced in July 2001. *Id.* ¶ 76.

Plaintiffs' allegations are again insufficient to demonstrate that defendants made misleading statements with scienter. First, plaintiffs do not challenge the accuracy of any of the factual data reported in the press release. Second, plaintiffs do not allege the time, place, or speaker of the allegedly misleading statement regarding JNI's estimates for second half 2001, as required by the PSLRA. Third, plaintiffs do not allege sufficient corroborating facts for their allegation of accounting manipulations. For instance, they do not explain why the $7.7 million "write-down for inventory" was required by GAAP. *See In re Peerless Sys. Corp. Sec. Litig.*, 182 F.Supp.2d 982, 991–92 (S.D.Cal.2002) (plaintiffs alleging accounting fraud must "allege enough information so that a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue"). Furthermore, they do not allege facts raising a "strong inference" that Purdy knew the write-down should have been taken in January of 2001. *Cf. Vantive*, 283 F.3d at 1090–91 (allegation of accounting manipulation was inadequate because plaintiffs "fail[ed] to allege specific contemporaneous conditions known to the defendants that would strongly suggest that the defendants understood [the challenged accounting practice] would result in overstated revenues"). Plaintiffs allege that JNI was "left with excess product" in fourth quarter 2000 due to "decrease in demand for JNI products," but, as noted above, they do not describe the alleged decrease in demand with any particularity. *See id.* ¶ 70. Plaintiffs also allege that there were conversations with Purdy about the write-down during the weekly meetings in late 2000 and early 2001, but they do not identify the specific dates, participants, or substance of these conversations. *See id.* ¶ 71.

### B. Defendants' Insider Trading

▮▮▮▮ Plaintiffs also contend that defendants' insider trading during the class period raises a strong inference of scienter. "If insiders owning much of a company's stock make rosy characterizations of company performance to the market while simultaneously selling off all their stock for no apparent reason, their sales may support inferences both that their rosy characterizations were false and that they knew it." *Ronconi*, 253 F.3d at 434–35. However, unusual or suspicious stock sales by corporate insiders constitute circumstantial evidence of scienter only if the trading is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from the undisclosed inside information." *Silicon Graphics*, 183 F.3d at 986 (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989)); *see also Vantive*, 283 F.3d at 1093. In evaluating whether insiders' stock sales are unusual or suspicious, courts consider (1) the amount and percentage of shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history. *Silicon Graphics*, 183 F.3d at 986. Another factor meriting consideration is whether the insider had any limitations on his or her ability to trade. *See No. 84 Employer–Teamster Joint Council Pension Trust Fund, v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir.2003).

▮▮▮▮ During the class period, defendant Flanagan sold 15.7% of his total holdings, including options; defendant Gregory sold 21% of his total holdings; defendant McKnett sold 23% of his total holdings, including options; defendant Wenaas sold 8.6% of his total holdings, including options; and defendant Stiska sold 12% of

his total holdings. FACC ¶¶ 23(a), (c)-(f). In *Ronconi*, the Ninth Circuit held that an insider's sale of 17% of his total holdings was not enough to be suspicious. *See* 253 F.3d at 435. Accordingly, the amounts sold by defendants Flanagan, Wenaas, and Stiska were not suspicious. In addition, in *Vantive*, the Ninth Circuit held that an insider's sale of 26% was not "terribly unusual or suspicious, given the complaint's failure to connect [defendant's] sales with any particular allegedly misleading statements." 283 F.3d at 1094. By this standard, the amounts sold by Gregory and McKnett—21% and 23%, respectively—are not suspicious, as plaintiffs have failed to connect these stock sales to any false or misleading statements.

■ Defendant Purdy, however, sold 87% of her total holdings, including options, which is a suspicious percentage, especially in light of plaintiffs' allegation that Purdy was the source of several allegedly false statements. However, "large numbers do not necessarily create a strong inference of fraud." *Vantive*, 283 F.3d at 1093. It is notable the Purdy only sold a small sum of the shares with which plaintiffs are concerned—60,000 out of over one million that plaintiffs claim were sold pursuant to defendants' scheme.

Moreover, the timing of the sales undermines any inference of suspiciousness, even with respect to Purdy. Defendants sold stock in late July, August, and during the Secondary Offering in October. *See* FACC ¶ 78. In July, defendants Gregory, McKnett, Wenaas and Stiska sold stock for $42 per share. In August, defendants Flanagan, Purdy, Gregory, and McKnett, sold stock for between $48 and $51 per share. From October 19–23, during the Secondary Offering, each of the defendants sold stock for $69.93. *Id.* Plaintiffs emphasize that defendants sold 20% of their aggregate holdings "during the time period when JNI was supposedly enjoying a period of exceptional business success." *Id.* ¶ 82. However, this necessarily means that defendants *retained* 80% of their holdings. This undermines plaintiffs' allegation that defendants were quietly trying to unload their JNI stock. Plaintiffs also offer a number of reasons why they believe defendants refrained from exercising their vested stock options—that defendants did not want any more of JNI's faltering stock, that they did not want to raise investors' suspicions, that they knew they could get the Board to re-price the options at a later date, etc. *See id.* ¶¶ 80–81. Plaintiffs do not explain, however, how they gained this insight into defendants' motives. An equally plausible inference from defendants' alleged behavior is that defendants held off exercising their options because they believed the company was doing well and that the value of the options would increase.

Further, plaintiffs fail to establish that defendants sold stock at a time "calculated to maximize the personal benefit from the undisclosed inside information." *Silicon Graphics*, 183 F.3d at 986. Plaintiffs allege that as a result of defendants' false and misleading statements, the price of JNI stock was artificially inflated to a price of over $100 per share, and peaked at $126 on November 6, 2000. FACC ¶ 17. However, the latest date any defendant sold stock was October 23, 2000, and the highest price at which any defendant sold was $69.93 per share. "When insiders miss the boat this dramatically, their sales do not support an inference that they are preying on ribbon clerks who do not know what the insiders know." *Ronconi*, 253 F.3d at 435. In *Ronconi*, the Ninth Circuit found no inference of scienter when defendants sold stock for $54 and the price later peaked at $74. *Id.; see also Vantive*, 283 F.3d at 1093–94 (no inference of scienter where insider sold at $20–$24 per share, and stock later peaked at $39).

Here, the defendants "missed the boat" by a far greater margin—they sold for between $42 and $70, and the peak price was $126.

Plaintiffs also allege that defendants' stock sales during the class period were out of line with their pre-class trading patterns. Although this is true, it also appears from the complaint that defendants might not have possessed large amounts of JNI stock prior to Jaymark's reorganization in July 2000. The complaint indicates that prior to July 2000, Jaymark owned 60% of JNI's stock. FACC ¶ 3. On July 24, 2000, Jaymark reorganized and distributed all of its JNI stock—14.175 million shares—to its stockholders, including the defendants (except Purdy). *See id.* ¶¶ 3, 37. If defendants did not possess much JNI stock before July 24, 2000, that would explain defendants' relatively modest stock sales prior to the class period. Because plaintiffs have not indicated how many shares defendants possessed prior to the class period—and the complaint itself raises an inference that they might not have had many—it is difficult to evaluate how defendants' stock sales during the class period compare with their prior trading.

■ Finally, plaintiffs suggest that the relatively low quantities of stock sold by defendants should not be controlling because defendants were prevented from selling more stock by lock-up agreements. Toward the beginning of the complaint, plaintiffs allege that the purpose of the lock-up agreements was to "keep JNI's share price inflated," but at a later point, they allege that the lock-up agreements were required by the underwriters of the Jaymark reorganization. *See* FACC ¶¶ 3, 32. Apparently shares that were distributed to defendants pursuant to the Jaymark reorganization were "locked up" for 180–360 days and could only be sold in a public offering, in which defendants would

be limited to selling 1/3 of their JNI holdings. FACC ¶¶ 3, 32. Later in the complaint, plaintiffs elaborate that Jaymark distributed 14.175 million shares of JNI stock to its shareholders—including defendants—of which 13.175 million shares could not be sold for 330 days, except in a public offering. *Id.* ¶ 37. Of the shares not sold in the offering, half would be locked up for 180 days, and the remainder would be locked up for 360 days. *Id.*

■ It is appropriate for the court to consider the insiders' restrictions on trading in determining whether their stock sales were suspicious. *See No. 84,* 320 F.3d at 938; *Ronconi,* 253 F.3d at 436. However, plaintiffs have not explained how the lock-up agreements support their allegation that defendants acted with scienter. It is unclear, for instance, how the lock-up agreements furthered defendants' scheme by inflating the stock prices. Equally unclear is why defendants—if they were so eager to rid themselves of JNI stock—would have entered into the lock-up agreements in the first place. Furthermore, if defendants were permitted under the lock-up agreements to sell up to 1/3 of their JNI stock in a public offering, it appears that they still did not sell the maximum amount they could have sold. According to plaintiffs, defendants in the aggregate sold only 20% of their JNI stock, and that was over the entire class period, not just during the offering. Thus, even taking into consideration defendants' limitations on trading, plaintiffs have failed to plead facts that establish defendants' stock sales were suspicious in quantity, price or timing.

### C. Plaintiffs' Causes of Action

#### 1. Section 10(b) of 1934 Act and Rule 10b–5

Plaintiffs allege that defendants violated § 10(b) of the Securities Exchange Act of

1934, 15 U.S.C. § 78j(b), and Rule 10b–5 of the Securities Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5. Section 10(b) makes it unlawful to "use or employ in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 makes it unlawful for any person to use interstate commerce:

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

■■■■■ In order to state a claim under § 10(b) and Rule 10b–5, plaintiffs must allege: (1) a misrepresentation or omission (2) of material fact (3) made with scienter (4) upon which plaintiffs justifiably relied (5) that proximately caused the alleged loss. *Binder v. Gillespie,* 184 F.3d 1059, 1063 (9th Cir.1999). Because falsity and scienter under § 10(b) and Rule 10b–5 can generally be inferred from the same set of facts, it is appropriate to collapse the PSLRA's separate pleading requirements for falsity and scienter into a single inquiry. *Ronconi,* 253 F.3d at 429. In determining whether falsity and scienter have been adequately plead under the PSLRA, the court considers whether the facts alleged in the complaint, taken as a whole, raise a strong inference that the defendants, intentionally or with deliberate recklessness, made false or misleading statements to investors. *See id.* at 429.

For the reasons discussed above, plaintiffs have failed to meet the PSLRA's pleading requirements. First, plaintiffs have not alleged sufficient facts to demonstrate that any of the quoted statements were false or misleading. Second, plaintiffs have not alleged sufficient facts to raise a strong inference that defendants made the statements with actual knowledge, or with deliberate recklessness, that they were false or misleading. Without these corroborating details, the complaint amounts to nothing more than allegations of "fraud by hindsight," which is exactly what the PSLRA was designed to prevent. *See Vantive,* 283 F.3d at 1084–85.

### 2. *Sections 11 and 12(a)(2) of the 1933 Act*

■■■■■ Plaintiffs also allege violations of §§ 11 and 12(a)(2) of the 1933 Act. Section 11 imposes liability for false statements or omissions of material fact in registration statements. *See* 15 U.S.C. § 77k. In order to state a claim under § 11, plaintiffs must allege "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is it would have misled a reasonable investor about the nature of his or her investment." *Stac,* 89 F.3d at 1403–04 (quoting *Kaplan v. Rose,* 49 F.3d 1363, 1371 (9th Cir.1994)). There is no requirement of scienter for a § 11 violation. *Id.* at 1404. Section 11 claims are not governed by the heightened pleading standards of the PSLRA, but they are still subject to Rule 9(b)'s requirement that allegations of fraud and mistake be pled with particularity. *See Falkowski v. Imation Corp.,* 309 F.3d 1123, 1133 (9th Cir.2002); *Stac,* 89 F.3d at 1404–05 (Rule 9(b) applies to § 11 claims grounded in fraud). Section 12(a)(2) im-

poses liability on sellers of securities if they use certain instruments, including a prospectus, that contain untrue statements or material omissions. *Falkowski,* at 1133–34; 15 U.S.C. § 77*l* (a)(2).

Both these claims are based on plaintiffs' claim that the Registration Statement and Prospectus issued in connection with the Secondary Offering contained false statements or omitted material facts. As discussed above, however, plaintiffs have failed to identify any false or misleading statements in these documents. Accordingly, these claims must be dismissed.

### 3. Section 20 of 1934 Act and Section 15 of 1933 Act

Finally, plaintiffs assert theories of "control person" liability over defendants Flanagan, Purdy and Wenaas under § 20 of the 1934 Act, 15 U.S.C. § 78t(a), and § 15 of the 1933 Act, 15 U.S.C. § 77*o*. However, because plaintiffs have failed to state a claim for primary liability under either the 1934 Act or the 1933 Act, these claims must also be dismissed. *See Heliotrope Gen., Inc. v. Ford Motor Co.,* 189 F.3d 971, 978 (9th Cir.1999); 15 U.S.C. § 77*o*.

### III. *Conclusion*

For the reasons stated herein, defendants' motion to dismiss is **GRANTED**. Plaintiffs' complaint is **DISMISSED WITHOUT PREJUDICE**, and plaintiffs are **GRANTED** leave to amend their complaint within **60 days** after this order is stamped "filed." Plaintiffs shall correct the pleading deficiencies noted herein as follows:

1. Specify each statement alleged to be false or misleading, and

 (a) For oral statements, indicate when, where, by whom, and under what circumstances the statement was made. If the allegation is not based on personal knowledge, state with particularity all facts upon which plaintiffs formed the belief that one or more of the defendants made the statement at the time and place at which it is alleged to have been made.

 (b) For written statements, identify the document in which it appeared, including the title, author, and date issued, and state with particularity all facts that support plaintiffs' belief that the statement is attributable to defendants.

 (c) State with particularity why the statement was false or misleading at the time it was made, and state with particularity all facts upon which plaintiffs formed the belief that the statement was false or misleading.

 (1) If plaintiffs allege that the falsity of the statement is shown by conflicting information in internal reports, identify the report (title, author, date prepared, and contents), and specify which portions of the report contradicted the statement alleged to be false or misleading.

 (2) If plaintiffs allege that the falsity of the statement is shown by contemporaneous information inconsistent with the statement, state with particularity what the contemporaneous information was, the source of the information, and how plaintiffs learned of the information.

2. For each fact alleged to demonstrate scienter, state as to each defendant:

 (a) All facts supporting plaintiffs' belief that the defendant knew each statement was false or misleading.

 (1) If it is alleged that the defendant received or possessed documents or information contrary to alleged false or misleading statements, state all relevant facts sup-

porting this belief, including the specific nature of the information and how plaintiffs know each defendant received the information;

(2) If plaintiffs allege the defendant obtained the information in a form other than written, indicate the specific nature of the information, and how plaintiffs know such information was communicated to the defendant.

(b) All particular facts supporting plaintiffs' belief that the defendant's insider trading during the class period was unusual or suspicious, including details about his or her prior trading history and any relevant limitations on his or her ability to trade.

Defendants' motion to strike is **DENIED** as moot.

**IT IS SO ORDERED.**