**In re INFONET SERVICES CORPORATION SECURITIES LITIGATION**

**No. CV 01–10456 NM(Cwx).**

United States District Court, C.D. California.

Aug. 12, 2003.

Edward P. Dietrich, Helen J. Hodges, William S. Lerach, Jonathan E. Behar, Milberg Weiss Bershad Hynes & Lerach, Los Angeles, CA, Kevin M. Prongay,

Prongay & Borderud, Lionel Z. Glancy, Michael M. Goldberg, Robert M. Zabb, Glancy & Binkow, Los Angeles, CA, for Plaintiff.

Hugh S. Wilson, Julia E. Parry, Ryan Hart Harrigan, Leigh A. Bradberry, Elisabeth R. Cannon, Latham and Watkins, San Diego, CA, John B. Quinn, Shon Morgan, Thad Alan Davis, Quinn Emanuel Urquhart Oliver & Hedges, Marc Marmaro, Jeffer Mangels Butler & Marmaro, Germain D. Labat, III, Mayer Brown Rowe & Maw, Debra J. Albin–Riley, Winston & Strawn, Marc T.G. Dworsky, Munger Tolles & Olson, Los Angeles, CA, Charles F. Kester, Kester & Isenberg, Encino, CA, George Borden, Matthew J. Herrington, Paul Martin Wolff, Williams & Connolly, Ralph A. Taylor, Jr., Dorsey & Whitney, Washington, DC, David M. Jacobson, Evan L. Schwab, Dorsey & Whitney, Seattle, WA, Kent J. Schmidt, Dorsey & Whitney, Irvine, CA, for Defendant.

## ORDER GRANTING DEFENDANTS INFONET SERVICES CORP., JOSE A. CALLAZO, AKBAR H. FIRDOSY, ERIC DE JONG, MORGAN EKBERG, MASAO KOJIMA, JOSEPH NANCOZ, RAFAEL SAGRARIO, AND DOUGLAS CAMPBELL'S MOTION TO DISMISS

MANELLA, District Judge.

### I. INTRODUCTION

On December 16, 1999, Infonet Services Corporation made an initial public offering ("IPO") of its Class B common stock. Since the IPO, Infonet's initial stock price of $21 has declined significantly. Plaintiffs allege that the drop in Infonet's stock price was caused by problems arising out of Infonet's management of AT & T Unisource Communications Services ("AUCS"). Plaintiffs assert that Defendants knew about these problems prior to the IPO, but fraudulently concealed this information both during and shortly after the IPO in an effort to inflate the price of Infonet's publicly traded stock. As a result, Plaintiffs brought the instant class action against Infonet, its directors, the underwriters who were involved with Infonet's IPO, and various foreign telecommunications companies that owned shares of Infonet. The Plaintiff Class consists of all purchasers of the publicly-traded securities of Infonet from December 16, 1999, the day of Infonet's IPO, through August 7, 2001 (the "Class Period"). Compl. ¶ 4. Plaintiffs assert that Defendants' conduct in connection with Infonet's IPO violated the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Securities Exchange Act").

Plaintiffs assert four causes of action against Defendants Infonet Services Corporation ("Infonet") and Jose A. Collazo, Akbar H. Firdosy, Eric M. de Jong, Morgan Ekberg, Masao Kojima, Joseph Nancoz, Rafael Sagrario, and Douglas Campbell's (the "Individual Defendants") for: (1) violation of §§ 11 and 15 of the Securities Act; (2) violation of §§ 12(a)(2) and 15 of the Securities Act; (3) violation of § 10(b) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder; and (4) violation of § 20(A) of the Securities Exchange Act. Presently before the court is Defendants' motion to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6).

### II. FACTUAL BACKGROUND [1]

In 1969, Infonet began operations as part of Computer Sciences Corporation

1. These facts, taken from the Consolidated Class Action Complaint ("Complaint") and Infonet's Prospectus issued December 15,

("CSC"). *See* Infonet Prospectus, Parry Decl., Ex. A at 4. After a series of transactions from 1988 to 1992, CSC sold its ownership in Infonet to a group of six major international telecommunications companies, including KDD Corporation (Japan), KPN Telecom B.V. (The Netherlands), Swisscom AG (Switzerland), Telefónica International Holding B.V. (Spain), Telia AB (Sweden), and Telstra Corporation Limited (Australia) (collectively, the "Foreign Telecoms"). *See id.* at 45; Compl. ¶ 5, 33. Infonet provides data communications services to multinational corporations in more than 100 countries through "The World Network," its own data communications network that purportedly serves as a private and secure version of the Internet for its clients. *See* Infonet Prospectus, Parry Decl., Ex. A at 4; Compl. ¶ 25. Infonet sells its services through its country representatives and indirectly through major international telecommunications carriers and value added resellers. Compl. ¶ 25.

### 1. The AUCS Transaction

AT & T Unisource Communications Services ("AUCS") was a joint venture between AT & T Corporation and Unisource N.V. *See* Infonet Prospectus, Perry Decl., Ex. A at 5; Compl. ¶ 5. AUCS provided international voice, data, Internet, and messaging services to corporations located primarily in Europe and the United States.

Infonet Prospectus, Perry Decl., Ex. A at 5. Unisource is owned by three of Infonet's stockholders, KPN, Swisscom, and Telia. Compl. ¶ 5. In July 1998, AT & T announced that it would opt out of the joint venture, prompting AUCS to seek a new partner capable of outsourcing its services beyond Europe and providing international networking services previously provided by AT & T. *Id.*

Plaintiffs allege that AUCS could not be sold to an independent third party because it did not have adequate accounting systems in place to bill its customers for their network usage on a monthly basis. *See* Compl. ¶ 6. Instead, AUCS "revenues" were determined by a year-end negotiation between AUCS and its owners, KPN, Swisscom, and Telia. *Id.* Thus, Plaintiffs assert, KPN, Swisscom, and Telia knew that AUCS could not be sold to an independent company because these accounting problems would be uncovered by the buyer during the "due diligence" investigation. *Id.* Plaintiffs allege that to avoid these problems, KPN, Swisscom, and Telia allegedly agreed "to dump the AUCS business on Infonet, another company they controlled." *Id.*

On September 30, 1999, Infonet entered into a series of agreements with AUCS, Unisource, KPN, Swisscom, and Telia ("the Agreements"), under which it agreed to manage AUCS for a three-year term.[2]

1999, are assumed to be true for purposes of this motion only.

Plaintiffs assert that the court may not take judicial notice of certain SEC filings submitted by Movants upon which the Complaint relies. *See* Pls. Opp. to Underwriters' RJN at 2–3. In deciding a motion to dismiss a securities fraud action, however, a court may take judicial notice of matters of public record outside the complaint without converting the motion into one for summary judgment. *See* *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.1986). It is well established that a court may consider SEC filings in a

motion to dismiss a securities fraud complaint to determine "whether or when certain information was provided to the market." *In re PetSmart, Inc. Sec. Litig.*, 61 F.Supp.2d 982, 987 n. 1 (D.Ariz.1999); *see also Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1275–78 (11th Cir.1999) (Judicial notice of SEC filings proper when considered "for the purpose of determining what statements the documents contain and not to prove the truth of the documents' content.").

2. The Agreements are attached to Infonet's Registration Statement as Exhibits 10.12, 10.13, 10.14, and 10.15. *See* Parry Decl.,

Infonet represented to the public that one benefit of the Agreements was that Infonet would gain access to approximately 1,300 multinational clients of KPN, Swisscom, and Telia that were being served by AUCS at the time of the transaction, as well as to any additional multinational clients KPN, Swisscom, and Telia would serve in the future. *See* Infonet Prospectus, Parry Decl., Ex. A at 55; Compl. ¶ 7. Infonet asserted that through this access, Infonet could market its services with the aim of transitioning the multinational clients to The World Network, thus significantly increasing its client base. Defendants allegedly represented that Infonet's "infrastructure will be sufficient to transi-

tion these clients" to The World Network. Compl. ¶ 7. In exchange for the right to market its services to the multinational clients and $40 million in cash, Infonet issued an aggregate of 47.87 million shares of Infonet's Class B stock to KPN, Swisscom, and Telia under stock purchase agreements. Infonet Prospectus, Parry Decl., Ex. A at 5.

Plaintiffs assert that Defendants concealed the "true nature" of the transaction, *viz.*, that Infonet *de facto* purchased AUCS "on credit in an 'off-balance' sheet transaction[.]" Compl. ¶ 28; Opp. at 6.[3] Plaintiffs assert that KPN, Swisscom, and Telia structured the transaction through the Agreements to avoid numerous problems.

Exs. C–F. The Agreements are as follows. In the "Assignment Agreement," Infonet was assigned all the distributor contracts between AUCS and distributors KPN, Swisscom, Telia, and others. *See* Parry Decl., Ex. F. Infonet also was assigned the obligation to deliver services to the distributors. The distributors had agreements to provide services to the end-users of AUCS services ("AUCS users"). *Id.*

Pursuant to a "Services Agreement," AUCS, Unisource, Swisscom, and Telia allegedly agreed to assign Infonet the services contracts that AUCS previously provided to the distributors. Infonet would then sell these services to the distributors. *See* Parry Decl., Ex. E. Under the Services Agreement, Infonet would buy the services at a price that would guarantee Infonet approximately 20% gross margin on the sale of the services to the various distributors. *Id.* The Services Agreement was terminable by any party on 180 days notice. *Id.*

Pursuant to a "Management Agreement," Infonet agreed to Manage AUCS for three years for a quarterly management fee equal to 1.5% of the total consolidated revenues of AUCS, up to an aggregate maximum of $18.3 million. *See* Parry Decl., Ex. E. Infonet also could receive an incentive payment based on any improvement in AUCS' financial performance at the end of the three-year term. *Id.* Unisource, as the owner of AUCS, had the right to terminate the Management Agreement on 180 days notice. *Id.*

Finally, Infonet entered into a "Call Option Deed," which gave Infonet the option to purchase the assets of AUCS over a period of three years at a fair market value not to exceed $130 million. Parry Decl., Ex. D. The deed allowed Infonet to purchase the AUCS assets so that it could continue to offer AUCS services to Infonet clients if the Services Agreement was terminated. *Id.* The call option was subject to regulatory approval, and was conditioned on AUCS's ability to fulfill its contractual obligations to third parties. *Id.*

3. Plaintiffs bolster this assertion with allegations that the AUCS transaction originally announced that Infonet would acquire AUCS pursuant to a Memorandum of Understanding ("MOU"), by which Infonet would acquire all of AUCS's assets. Compl. ¶ 39. Plaintiffs allege that during the "due diligence" investigation of the "AUCS acquisition," Infonet executives learned of AUCS's inability to invoice the end-users of AUCS services, and that revenues were instead negotiated annually. *See* Compl. ¶¶ 43, 92. Plaintiffs assert that because Defendants wanted to offer an IPO of Infonet stock, they did not want to acquire AUCS outright, as such an acquisition would require them to present three years of AUCS's audited financial statements in conjunction with the IPO. Compl. ¶¶ 44–46. As a result, Plaintiffs argue, Defendants restructured the transaction in an attempt to disguise a *de facto* sale as a management agreement. *Id.*

First, the transaction allegedly allowed KPN, Swisscom, and Telia to sell AUCS before incurring a loss of AT & T's annual "revenues." *See* Compl. ¶ 38. Second, it allegedly allowed Unisource to "sell" AUCS publicly despite the fact that AUCS's accounting policies allegedly did not conform to GAAP, and were not in compliance with the Foreign Corrupt Practices Act's "books and records" provisions, as set forth in § 13(b)(2) of the Securities Exchange Act. *Id.* Finally, the transaction purportedly allowed Unisource and its owners, KPN, Swisscom, and Telia, to avoid various disclosures about AUCS's losses as required under the Securities Act, 15 U.S.C. § 77aa. *Id.*

## 2. The Initial Public Offering

On December 15, 1999, the SEC declared Infonet's Prospectus and Registration Statement effective. Compl. ¶ 54.[4] In the Prospectus, Infonet described the AUCS transaction in detail. *See* Infonet Prospectus, Parry Decl., Ex. A at 5, 55–56. In its discussion of the AUCS transaction, the Prospectus stated that the Agreements "will give us access to [KPN, Swisscom and Telia's] approximately 1,300 multinational corporate clients currently being served by AUCS as well as additional multinational clients to which KPN, Swisscom and Telia may provide services in the future." *Id.* at 5, 55. The Prospectus also stated that Infonet "believe[d] our [its] infrastructure will be sufficient to transition these clients." *Id.* at 56.

The Prospectus cautioned, however, that "[w]hile we will attempt to transition the multinational clients to The World Network as soon as possible, we expect the transition will be implemented over a period of 12 to 18 months." Infonet Prospectus, Parry Decl., Ex. A at 56. The

Prospectus further cautioned that "[t]he percentage of total revenues from the multinational clients attributable to AUCS services and to our services is expected to vary depending on the degree of the transition's success and the time necessary to transition the multinational clients to The World Network." *Id.* at 56. The Prospectus warned future investors that "[s]ince the multinational clients have no obligation to use our services, we cannot assure you that all of the multinational clients will transition to our network, that the multinational clients which do transition to our network will continue to purchase our services or, if they continue to use our services after the transition, that the multinational clients will purchase as many or more services from us than they did from AUCS." *Id.* The Prospectus also disclosed that AUCS had a history of operating losses, totaling approximately $409 million over a three-year period. *See id.* at 56 ("From its formation in 1996 to December 31, 1998, AUCS cumulative EBITDA losses were approximately $409 million.").

Plaintiffs assert that the Prospectus was misleading because it failed to disclose numerous facts they assert were material to the value of the stock. For instance, Plaintiffs allege that the Prospectus failed to disclose various technological hurdles rendering the transition of AUCS users to the World Network difficult. Such technological problems included the differing types and locations of switches used in the AUCS and Infonet networks, the visibility of the end-users in the AUCS and Infonet networks, and the inability of AUCS to invoice end-users monthly. *See* Compl. ¶¶ 75–93. Plaintiffs also assert that the Prospectus's figure of 1,300 multinational

---

4. The Registration Statement was signed by Defendants Collazo, Firdosy, Campbell, de Jong, Ekberg, Kojima, Nancoz, and Sagrario.

AUCS users was significantly inflated. Finally, Plaintiffs allege that the Prospectus misrepresented the nature of the AUCS transaction, and failed to disclose AUCS's alleged accounting problems. *See* discussion *supra* at 1085.

On December 16, 1999, the IPO commenced at an offering price of $21 per share. Compl. ¶ 54. The managing underwriters for the IPO were Merrill Lynch & Co., Warburg Dillon Read LLC, ABN AMRO Rothschild, Goldman, Sachs & Co., Lehman Brothers, and Salomon Smith Barney. *Id.* ¶ 55. During the IPO, the Foreign Telecoms allegedly sold over 20 million shares of Infonet stock during the IPO for proceeds of over $400 million. *Id.* ¶ 4. Infonet and the selling shareholders purportedly sold 51,282,300 shares of common stock at $21.00 per share for an aggregate price of approximately $1.076 billion. *Id.* ¶ 54. The Registration Statement also provided the underwriters an option to purchase an additional 7,692,342 shares of common stock to cover over allotments. *Id.* On January 13, 2000, the Underwriters purchased these additional shares. *Id.*

### 3. The Nature of the Instant Action

Plaintiffs allege that Infonet's stock price dropped when the market learned the allegedly "true" facts about the AUCS transaction. *See* Compl. ¶¶ 122–128. Plaintiffs assert that Defendants fraudulently concealed: (1) that the migration of AUCS users to the Infonet network was prohibitively expensive and complicated; (2) that AUCS required massive upgrades with its financial and billing systems; and (3) the "true nature" of the AUCS transaction. Plaintiffs allege that if Defendants had disclosed this information at the time of the IPO, Defendants could not have taken Infonet public, as the market would have been unreceptive to such disclosures. As a result of these purported misrepresentations, Plaintiffs allege, Infonet's stock traded at inflated levels during the Class Period, only to fall significantly as the problems with its AUCS business were revealed to the market.

## III. LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the claims asserted in the complaint and is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988). When evaluating a Rule 12(b)(6) motion, the court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *See Barron v. Reich,* 13 F.3d 1370, 1374 (9th Cir.1994). However, the court is not bound to assume the truth of legal conclusions merely because they are stated in the form of factual allegations. *See Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981). Dismissal is proper if a complaint is vague, conclusory, or fails to set forth material facts in support of the allegation. *See North Star Int'l v. Arizona Corp. Comm'n,* 720 F.2d 578, 583 (9th Cir.1983); *see also Bautista v. Los Angeles County,* 216 F.3d 837, 841 (9th Cir.2000) (holding that dismissal for failure to comply with Federal Rules of Civil Procedure is within the court's discretion). Plaintiff bears the burden of pleading sufficient facts to state a claim. Courts will not supply essential elements of a claim that were not initially pled. *Richards v. Harper,* 864 F.2d 85, 88 (9th Cir.1988).

Generally, a court may not consider material outside of the complaint, unless a court converts the Rule 12(b)(6) motion into a summary judgment. *See Levine v. Diamanthuset, Inc.,* 950 F.2d 1478, 1483 (9th Cir.1991). A court may, however,

consider exhibits submitted with the complaint and matters that may be judicially noticed pursuant to Fed.R.Evid. 201. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 at n. 19 (9th Cir.1989); *Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279 (9th Cir. 1986), *abrogated on other grounds by Astoria Federal Savings and Loan Ass'n v. Solimino*, 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991).

On a motion to dismiss the securities law claims asserted in this case, however, the court may consider the full text of the relevant documents to determine whether the plaintiffs have alleged material misrepresentations or omissions. *See In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1405 n. 4 (9th Cir.1996). Such consideration does not convert the motion into one for summary judgment. *See id.* The standard for determining whether the relevant documents contain material misrepresentations or omissions is whether a reasonable investor would have been misled about the nature of its investment in the securities at issue. *See In re VeriFone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir.1993).

Moreover, a motion to dismiss a Securities Exchange Act claim requires consideration of the standards for pleading fraud set forth in the Private Securities Litigation Reform Act ("PSLRA"). Two provisions are pertinent. Section 78u–4(b)(1) provides that if the plaintiff alleges an untrue statement of material fact or an omission of material fact:

> [the complaint] shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information an belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1). Section 78u–4(b)(1) also sets forth a standard for pleading facts upon which an allegation of scienter in based where plaintiff makes a claim of fraud:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2). To satisfy these requirements with respect to a claim brought under § 10(b) of the Securities Exchange Act and Rule 10b–5, a plaintiff must plead "in great detail" facts "giving rise to a strong inference of . . . at least deliberate recklessness." *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 985 (9th Cir.1999).

## IV. APPLICATION

### 1. Bespeaks Caution Doctrine

Defendants contend that their forward-looking statements made in connection with Infonet's IPO are protected by the so-called "bespeaks caution" doctrine. *See* Mot. at 9–13. The bespeaks caution doctrine protects affirmative, forward-looking statements from becoming the basis for a securities fraud claim when they are accompanied by cautionary language or risk disclosure. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994). Put more simply, "the 'bespeaks caution' doctrine reflects the unremarkable proposition that statements must be analyzed in context." *Rubinstein v. Collins*, 20 F.3d 160, 167 (5th Cir.1994).

■ However, the "inclusion of *some* cautionary language is not enough to sup-

port a determination as a matter of law that defendants' statements were not misleading." *In re Stac Electronics,* 89 F.3d at 1408 (internal quotations omitted). The cautionary language cannot be "so generalized in nature that a reasonable jury could nonetheless find the prospectus misleading." *Gray v. First Winthrop Corp., as amended,* 82 F.3d 877, 884 (9th Cir.1996). Instead, "the language bespeaking caution [must] relate directly to that [as] to which plaintiffs claim to have been misled." *In re Worlds of Wonder,* 35 F.3d at 1415 (quoting *Kline v. First W. Gov't Sec., Inc.,* 24 F.3d 480, 489 (3d Cir.1994)).

The bespeaks caution doctrine "has developed to address situations in which optimistic projections are coupled with cautionary language—in particular relevant specific facts or assumptions—affecting the reasonableness of reliance on and the materiality of those projections." *Rubinstein,* 20 F.3d at 167. It is meant "to minimize the chance that a plaintiff with a largely groundless claim will bring a suit and conduct extensive discovery in the hopes of obtaining an increased settlement." *See In re Worlds of Wonder,* 35 F.3d at 1415. A court should not apply the doctrine too broadly, however, as "an overbroad application of the doctrine would encourage management to conceal deliberate misrepresentations beneath the mantle of broad cautionary language." *Id.* (quoting *In re Worlds of Wonder Sec. Litig.,* 814 F.Supp. 850, 858 (N.D.Cal.1993)).

### a. *Alleged Misstatements in the Prospectus and Registration*

■ Plaintiffs allege that in the Prospectus and Registration Statement Defendants misrepresented the feasibility of transitioning the AUCS users to Infonet's network. *See* Compl. ¶¶ 7, 14–20, 75–93, 159–61 (describing in detail the technological difficulties in transitioning AUCS's users to the World Network). The alleg-

edly misleading forward-looking statements included the following language:

(1) "Our agreements with KPN, Swisscom and Telia will give us access to their approximately 1,300 multinational clients corporate clients currently being served by AUCS[,] as well as additional multinational clients to which KPN, Swisscom and Telia may provide services in the future." Infonet Prospectus, Parry Decl., Ex. A at 5, 55;

(2) "We believe these [AUCS] Agreements will increase the number of multinational corporate clients to which we may offer our services." *Id.* at 55;

(3) "We . . . intend to sell these multinational clients our services as a supplement or replacement of services previously provided by AUCS and, over time, we expect to transition the multinational clients onto The World Network." *Id.;*

(4) "While we will attempt to transition the multinational clients to The World Network as soon as possible,.we expect the transition will be implemented over a period of 12 to 18 months." *Id.* at 56.

(5) "Since we already have The World Network, an existing sales and marketing force and other elements necessary to service these multinational clients, we believe our infrastructure will be sufficient to transition these clients." *Id.*

Plaintiffs assert that the Prospectus misled investors regarding the number of users Infonet would gain from the AUCS transaction through its "direct relationship with AUCS end-users," because it did not disclose various technical problems that hindered the transition of AUCS users, of which Defendants allegedly were aware at the time of the IPO.

However, the Prospectus included a plethora of cautionary statements warning potential investors of the risks associated with the transition of AUCS users to the Infonet network, and advising that Infonet would not necessarily gain clients or revenue from the access to AUCS users gained in the AUCS transaction. Such warnings included the following:

(1) "The multinational corporate clients of KPN, Swisscom and Telia, currently using AUCS services, have no obligation to use our services. As a result, we cannot assure you that any significant number of these clients will continue to use the AUCS services we will provide or transition to The World Network during the next 12 to 18 months or at all. . . . Thus, our access to this additional client base may not yield substantial additional revenue." Infonet Prospectus, Parry Decl., Ex. A at 10; [5]

(2) "Because it is not possible to predict the multinational clients' future needs, the multinational clients' contributions to AUCS total revenue is not indicative of any contribution they may make to our revenues." *Id.* at 55;

(3) "The percentage of total revenues from the multinational clients attributable to AUCS services and to our services is expected to vary depending on the degree of the transition's success and the time necessary to transition the multinational clients to The World Network." *Id.* at 56;

(4) "Since the multinational clients have no obligation to use our services, we cannot assure you that all of the multinational clients will transition to our network, that the multinational clients which do transition to our network will continue to purchase our services or, if they continue to use our services after the transition, that the multinational clients will purchase as many or more services from us than they did AUCS." *Id.* at 56. [6]

Plaintiffs assert that the bespeaks caution doctrine does not protect Defendants' statements regarding the transition of AUCS users because the statements reflected "present effects" of a past event, namely, Infonet's entry into the Agreements three months prior to the IPO. *See* Opp. at 27–28 (citing *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 937 (9th Cir.2003)). However, the purported misrepresentations were

---

**5.** Indeed, this statement was included in the Prospectus's "Risk Factors." An investor reading the Prospectus was expressly directed to read the "Risk Factors" on the front page of the Prospectus. *See* Infonet Prospectus, Parry Decl., Ex. A at 1 (emphasis in original) (**"Investing in our Class B common stock involves risks which are described in the 'Risk Factors' section beginning on page 6 of this prospectus."**). Among the "Risk Factors," the Prospectus stated, in bold, that **"We may expend extensive managerial and operational resources to transition the multinational clients of KPN, Swisscom and Telia without receiving a corresponding increase in revenues."** *Id.* at 10 (emphasis in original). The cautionary statement quoted in the text above followed this warning.

**6.** In fact, the Prospectus's "Risk Factors" also forewarned potential investors of possible future litigation due to the potential volatility of Infonet's stock. *See* Infonet Prospectus, Parry Decl., Ex. A at 16 ("The stock market has experienced significant price and volume fluctuations, and the market prices of global communications companies have been extremely volatile. . . . In the past, following periods of volatility in the market price of a public company's securities, securities class action litigation has been often instituted against that company. This litigation could result in substantial costs and a diversion of management's attention and resources.").

forward-looking statements of Infonet's expectations concerning the impact of these newly entered Agreements. The only "present effect" described in the alleged misstatements was that at the time of the IPO, Infonet had access to AUCS users to which it could market its services. Any statement regarding the potential success of such marketing was a forward-looking statement. *See In re Lockheed Martin Corp. Sec. Litig.*, 272 F.Supp.2d 944, 949–50 (C.D.Cal.2003) ("While the Court agrees that statements based on current fact are actionable, it is unwilling to stretch that principle into one in which predictions of future events become actionable merely because they happen to have some basis in present facts.").

Plaintiffs also argue that the cautionary statements were inadequate because they were "boilerplate warnings" that did not directly address Defendants' alleged misstatements. Plaintiffs insist that to adequately warn potential investors, the Prospectus should have explained that: (1) Defendants did not have a plan to transition the AUCS users; (2) there were "tremendous technological hurdles that had to be overcome" to transition AUCS users to Infonet's network; (3) AUCS was not able to bill its customers on a monthly basis; and (4) AUCS's "revenues" were based on end of the year negotiating. *See* Opp. at 27–30.

Contrary to Plaintiffs' assertion, the cautionary statements "[were] substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371–72 (3d Cir.1993). The Prospectus contained many specific cautionary statements about the potential risks involved in transitioning AUCS users to the Infonet network, and expressly advised that Infonet's "access to [the] additional [AUCS] client base may not yield substantial revenue." Infonet Prospectus, Parry Decl., Ex. A at 10. For instance, the Prospectus disclosed that any attempt to transition AUCS users to the World Network could result in the expenditure of substantial resources without a corresponding increase in revenues. *See id.* at 10 ("We may expend significant managerial and operational resources to transition the multinational clients ... without receiving a corresponding increase in revenues."). The Prospectus also expressly warned potential investors that there was no guarantee that any of the AUCS users would migrate to the Infonet network, or that these migrations would occur within the estimated 12 to 18 months. *See* Infonet Prospectus, Parry Decl., Ex. A at 10 ("The multinational corporate clients ..., currently using AUCS services, *have no obligation to use our services.* As a result, we cannot assure you that any significant number of these clients will ... transition to the World Network during the next 12 to 18 months or at all.") (emphasis added).

The Prospectus also adequately represented that AUCS was not a successful venture, and that Infonet's management of AUCS would be a challenging feat. *See id.* at 10 ("AUCS has a history of operating losses."); *id.* at 56 ("From its formation in 1996 to December 31, 1998, AUCS cumulative EBITDA losses were approximately $409 million"). Indeed, the Prospectus specifically warned potential investors that "[w]hile we expect that our management will improve the performance of AUCS during the tree-year term of the management agreement, we cannot assure you that AUCS losses will decrease, that we will receive any incentive fee or that we will not have to rebate all or part of our management fee." *Id.*

In sum, the cautionary statements adequately addressed future projections con-

cerning the potential transition of AUCS users. The Prospectus and Registration Statement, read as a whole, contained ample specific cautionary language to put a reasonable investor on notice that the AUCS transaction would not necessarily result in the successful transition of AUCS users. *See In re Stac Electronics,* 89 F.3d at 1409 ("Analyzing the quoted statements in context leads to the inexorable conclusion that investors were specifically and adequately cautioned about the relevant risks."). A reasonable investor who read the Prospectus could not have been caught off guard by the disappointing number of migrating AUCS users to the Infonet network. *See Fecht v. The Price Co.,* 70 F.3d 1078, 1082 (9th Cir. 1995) (The bespeaks caution doctrine should apply when "the documents containing defendants' challenged statements include *enough* cautionary language or risk disclosure that 'reasonable minds' could not disagree that the challenged statements were not misleading.") (emphasis in original) (internal quotations and citations omitted). Accordingly, the "bespeaks caution" doctrine protects Infonet's forward-looking statements contained in the Prospectus and Registration Statement regarding the potential migration of AUCS users to the Infonet network.

### b. *Alleged Statements Made In Roadshow Presentations & Press Releases*

Plaintiffs assert that Defendants made material misstatements in press releases and during roadshow presentations prior to the IPO concerning their plan to transition various AUCS users to The World Network. Some of these alleged misstatements were: (1) that the AUCS transaction "promised to more than double the size of Infonet;" (2) that the AUCS transaction would generate 60% revenue growth in 2000 and 2001; (3) that the AUCS transaction would increase Infonet's revenues from $303 million in 1999 to $780 million in 2001 and to over $1 billion in 2002; and (4) that AUCS would generate $119 in revenues in 2000, $275 million in 2001, $373 million in 2002, and over $500 million in 2003. *See* Compl. ¶¶ 5, 52, 94.

Even were these statements made in roadshow presentations or press releases, the bespeaks caution doctrine would apply, due to cautionary statements made in the Prospectus. It is well established that statements made during roadshow presentations and other preliminary press releases are "immaterial [when] they are contradicted by plain and prominently displayed language in the prospectuses." *Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 9 (2d Cir.1996); *see also Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 351 (2d Cir.1993) (plaintiffs cannot rely on oral statements to establish claim when offering materials contradict oral statements); *Fecht,* 70 F.3d at 1081–82 (considering cautionary language in separate document with respect to oral statements); *In re Splash Tech. Holdings, Inc. Sec. Litig.,* 2000 WL 1727377 at *10 (N.D.Cal.2000) (bespeaks caution doctrine protects oral forward-looking statements when cautionary statements were in SEC filings and registration statement).[7] Because a regis-

---

7. Relying on an unpublished decision, *In re HI/FN, Inc. Sec. Litig.,* 2000 WL 33775286 (N.D.Cal.2000), Plaintiffs assert that Defendants' comments in press releases and roadshow presentations cannot be protected by cautionary statements in the Prospectus. This case stands only for the proposition that positive statements made in press interviews cannot be protected by cautionary statements made in routine quarterly SEC filings, particularly when the risks listed in the SEC filings had already occurred at the time of the oral statements. *Id.* at *5. In the instant action, the risks disclosed in the Prospectus had not yet occurred.

tration statement and its amendments are "formal documents of considerable legal weight," any misleading forward-looking statements made "in less formal press releases and interviews which were all closely proximate in time to the registration statement" may be fairly limited by "cautionary statements contained in the registration statement." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1123 (10th Cir.1997).

■ The Prospectus contained ample cautionary statements regarding the amount of revenue Infonet would realize from the AUCS transaction. Such statements included the following:

(1) "We may expend extensive managerial and operational resources to transition the multinational clients ... without receiving a corresponding increase in revenues." Infonet Prospectus, Parry Decl., Ex A at 10;

(2) "[O]ur access to this additional client base may not yield substantial additional revenue." *Id.;*

(3) "AUCS has a history of operating losses. If we are unable to reduce the losses of AUCS, we may not earn the incentive payments provided for in the management agreement and may be required to rebate our entire management fee." *Id.;*

(4) "Because it is not possible to predict the multinational clients' future needs, the multinational clients' contribution to AUCS total revenue is not indicative of any contribution they may make to our revenues." *Id.* at 55;

(5) "The percentage of total revenues from the multinational clients attributable to AUCS services and to our services is expected to vary depending on the degree of the transition's success and the time necessary to transition the multinational clients to The World Network." *Id.* at 56;

(6) "From its formation in 1996 to December 31, 1998, AUCS cumulative EBITDA losses were approximately $409 million. While we expect that our management will improve the performance of AUCS during the three-year term. of the management agreement, we cannot assure you that AUCS losses will decrease, that we will receive any incentive fee or that we will not have to rebate all or part of our management fee." *Id.*

These warnings contained in the Prospectus sufficiently conveyed that any future revenue predictions made during roadshow presentations or press releases issued in connection with the IPO were far from certain. Accordingly, these forward-looking revenue projections are rendered immaterial under the bespeaks caution doctrine.

## 2. Securities Act Claims

### a. *Applicability of Rule 9(b)*

■ Defendants contend that Plaintiffs' Securities Act claims are subject to the heightened pleading requirements of Fed. R.Civ.P. 9(b). *See* Mot. at 13–14. Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). "Rule 9(b) requires particularity as to the circumstances constituting fraud ... [including] time, place, persons, statements made, [and] explanations of why or how such statements are false or misleading." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 n. 7 (9th Cir.1994) (en banc), *superseded by statute on other grounds as stated in Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F.Supp. 1297 (C.D.Cal.1996). The Ninth Circuit has held that a plaintiff must satisfy the pleading requirements of Rule 9(b) when his or her § 11 or § 12 claim is "grounded in

fraud." *In re Stac Electronics,* 89 F.3d at 1404–05; *see also In re GlenFed,* 42 F.3d at 1545 ("This court has repeatedly recognized, implicitly or explicitly, that Rule 9(b) applies to actions brought under the federal securities law.") (citations omitted).

Plaintiffs dispute that Rule 9(b) applies to their claims, asserting that a negligence standard applies to their Securities Act claims. *See* Opp. at 12 ("Since a negligence standard applies, and fraud is not alleged in plaintiffs' § 11 claim, Fed. R.Civ.P. 9(b) does not apply."). Plaintiffs assert that their Securities Act claims are "based on principles of strict liability and negligence, not fraud." Compl. ¶ 137. This assertion is belied by Plaintiffs' allegations in the complaint, "where the gravamen of the complaint is plainly fraud[.]" *In re Stac Electronics,* 89 F.3d at 1405 n. 2. Significantly, Plaintiffs' Section 10(b) claim for securities fraud relies on the same allegations upon which their Sections 11 and 12 claims are based. *See* Compl. ¶ 186. Plaintiffs' assertion that their Securities Action claims are based only on negligence or strict liability "is untenable in light of the complaint's wholesale adoption of the allegations under the [Securities Exchange Act] fraud claims for the purposes of the Securities Act claims." *Melder v. Morris,* 27 F.3d 1097, 1100 n. 6 (5th Cir.1994), *as quoted in Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1104 (9th Cir. 2003); *see also Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1223 (1st Cir.1996)

("[D]espite the minimal requirements of Sections 11 and 12(2), a complaint asserting violations [of those sections] may yet 'sound in fraud.' For example, if a plaintiff were to attempt to establish violations of Sections 11 and 12(2) as well as the anti-fraud provision of the Exchange Act through allegations in a single complaint of a unified course of fraudulent conduct, fraud might be said to 'lie[ ] at the core of the action.' ") (citation omitted). Accordingly, because Plaintiffs' Section 11 and 12 claims are grounded in fraud, they must satisfy Rule 9(b)'s heightened pleading requirement.[8]

### b. *Section 11 Claim*

■ Section 11 of the Securities Act establishes liability for false and misleading statements made in registration statements. *See* 15 U.S.C. § 77k. Section 11 provides in pertinent part:

In case any part of the registration statement ... contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security ... may, either at law or in equity, in any court of competent jurisdiction, sue—

> (1) every person who signed the registration statement; [or]

> (2) every person who was director of (or person performing similar functions) or partner in the issuer at the

---

**8.** Plaintiffs assert that the court must disregard any portion of their Securities Act claims based on a fraud theory, and instead focus on their negligence allegations to which Rule 9(b) would not apply. *See* Opp. at 14 n. 6 (citing *Vess,* 317 F.3d at 1104). However, *Vess* recognized that when plaintiffs allege "a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim[,] ... the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must

satisfy the particularity requirement of Rule 9(b)." *Vess,* 317 F.3d at 1103–04. Plaintiffs' suggestion that the court bifurcate consideration of their Section 11 and 12 claims is disingenuous, as the course of conduct upon which these claims rely is inextricably grounded in fraud. *See Lone Star Ladies Inv. Club v. Schlotzsky's Inc.,* 238 F.3d 363, 368 (5th Cir.2001) ("[A] district court is not required to sift through allegations of fraud in search of some 'lesser included' claim of strict liability.").

time of the filing of the part of the registration statement with respect to which liability is asserted .... *Id.* Therefore, to establish a claim under Section 11, a plaintiff must allege: (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, "that is, it would have misled a reasonable investor about the nature of his or her investment." *Kaplan v. Rose,* 49 F.3d 1363, 1371 (9th Cir.1994), *cert denied,* 516 U.S. 810, 116 S.Ct. 58, 133 L.Ed.2d 21 (1995). Scienter is not required for liability under Section 11; defendants are "liable for innocent or negligent material misstatements or omissions." *Id.*[9]

Plaintiffs assert that the Prospectus and Registration Statement were misleading due to the inclusion of several non-forward-looking statements in the Prospectus and Registration Statement that were allegedly materially misleading. Plaintiffs also contend that the Prospectus and Registration Statement were misleading because Defendants falsely omitted material information. Defendants contend that Plaintiffs either: (1) fail to plead the falsity with the required particularity, or (2) fail to plead that Infonet had any duty to disclose the omitted information. The court will examine each allegation in turn.

i. *Infonet's "Access" to AUCS Users*

In the Complaint, Plaintiffs assert that Defendants misrepresented the nature of the AUCS transaction by concealing that Infonet actually "acquired" rather than agreed to "manage" AUCS and provide services to AUCS users. *See* Compl. ¶¶ 46–48. However, in their opposition to Defendants' motion to dismiss the Section 11 claim, Plaintiffs do not rely on these allegations, but instead focus on Defendants' representations regarding Infonet's "access" to "AUCS clients" resulting from the AUCS transaction. *See* Opp. at 17–20. Plaintiffs assert that this access was "purely illusory," because Infonet did not have "direct access" to the AUCS users as the users were instead direct clients of KPN, Telia, and Swisscom. *See* Opp. at 17.[10]

Plaintiffs' allegations are problematic for several reasons. First, the Prospectus did not represent that Infonet would have direct access to the AUCS users. Instead, the Prospectus clearly represented that the users were the clients of KPN, Telia, and Swisscom that used AUCS's services. For example, the "Recent Developments" section of the Prospectus stated that Infonet's "agreements with KPN, Swisscom and Telia will give us access to *their* approximately 1,300 multinational corporate clients currently being served by AUCS[.]" Infonet Prospectus, Parry Decl., Ex. A at 5. Among the "Risk Factors," the Prospectus warned future investors that "[t]he multinational corporate clients of KPN, Swisscom and Telia, currently using AUCS services, have no obligation to use our services." *Id.* at 10. Indeed, the section describing the transaction is entitled "Access to Multinational Corporate Clients of KPN, Swisscom and Telia." *Id.* at 55. These representations, among others, accurately reflected that the multinational companies to which Infonet gained access were clients of KPN, Telia, and Swisscom that utilized AUCS services, and the "access" that Infonet gained from the Agreements was to market its services to these

9. Because Section 11 claims may be based on negligent or innocent misstatements or omissions, the scienter requirement of Rule 9(b) does not apply to such claims. *See In re Stac Electronics,* 89 F.3d at 1405 n. 3.

10. Plaintiffs do not cite the source of the phrase "direct access."

multinational companies with the aim of expanding its client base.[11]

Plaintiffs' assertion that this access was merely "illusory" is belied by their own allegations. Plaintiffs assert that in exchange for access to the multinational clients and $40 million in cash, Infonet issued 47.84 million shares of Infonet Class B common stock to KPN, Telia, and Swisscom, which Plaintiffs assert were worth over $1 billion at the time of the IPO. *See* Opp. at 17. It is illogical to assume that a company would pay such a considerable sum for "illusory" access to a client base. Plaintiffs' allegation is further undermined by the fact that KPN, Telia, and Swisscom accepted Infonet's stock as consideration for Infonet's access to their clients. It would have been irrational for the three companies to accept as consideration 47.84 million shares of Infonet stock, only to breach their contractual obligations by thwarting Infonet's access to these clients, thus lessening the value of their Infonet stock. Moreover, Plaintiffs recognize that Infonet eventually marketed its services successfully and transitioned over 200 AUCS users to the Infonet network, further undermining Plaintiffs' assertion that the access was "illusory." *See* Opp. at 14. Accordingly, Plaintiffs have failed to allege that the Prospectus contained misleading

statements regarding Infonet's access to AUCS users.

#### ii. *The Number of AUCS Users*

■ Plaintiffs contend that the Prospectus's representation that Infonet would have access to approximately 1,300 AUCS users was materially misleading. *See* Opp. at 13–16.[12] Plaintiffs assert that the "true" number of AUCS users numbered between 500 and 950, as stated by various unnamed sources. *See* Compl. ¶¶ 9, 72, 73. For instance, Plaintiffs assert that an unspecified "former manager of the AUCS relationship" commented that there were 950 AUCS users and that allegedly an Infonet vice-president "knew it during due diligence." Compl. ¶ 72. Plaintiffs fail to allege how the vice-president learned this information, or how the manager learned of the vice-president's alleged knowledge. Plaintiffs also assert that an unspecified "AUCS director with responsibilities for financial planning" stated that the 1,300 customers "had to be too high because AT & T customers were to be lost, and many accounts were obsolete." *Id.* Plaintiffs fail to identify the director, or when the observation was made. Finally, Plaintiffs assert that their own investigation revealed that of the 950 customers, 200 to 300 were former AT & T customers and that KPN, Swisscom, and Telia had at most 740 customers as AUCS users. *Id.* ¶ 73. Plain-

---

11. Plaintiffs assert that the Prospectus was materially misleading because the "Registration Statement failed to disclose that because the customers belonged to KPN, Telia and Swisscom, they decided whether AUCS users would receive services from Infonet or other providers." *See* Opp. at 18. To the contrary, the Prospectus expressly warned that "[s]ince the multinational clients *have no obligation to use our services*, we cannot assure you that all of the multinational clients will transition to our network, [or] that the multinational clients which do transition to our network will continue to purchase our services[.]" Infonet Prospectus, Parry Decl., Ex. A at 56 (emphasis added). It is immaterial whether

KPN, Swisscom, and Telia allegedly "directed" these clients elsewhere for network services, as the Prospectus warned investors that the AUCS users "ha[d] no obligation to use [Infonet's] services[.]" *Id.*

12. To support this argument, Plaintiffs assert that "[r]representations or omissions concerning the issuer's customer figures are material," citing *Danis v. USN Communications, Inc.*, 73 F.Supp.2d 923, 935 (N.D.Ill.1999) and *In re AnnTaylor Stores Sec. Litig.*, 807 F.Supp. 990, 995, 998 (S.D.N.Y.1992). Neither case addresses this issue.

tiffs neither allege when this investigation occurred, nor provide any information about how Plaintiffs arrived at these numbers. These allegations do not meet the specificity required by Rule 9(b) because they do not adequately set forth the "time, place, persons, [and] statements made[.]" *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d at 1548 n. 7.[13]

### iii. *The Impact of KPNQwest Agreement*

■ Plaintiffs argue that the Prospectus was materially misleading because it did not disclose an agreement between KPN and KPNQwest, an alleged competitor of Infonet, entered into on November 5, 1999 ("KPNQwest Agreement"). *See* Opp. at 19. Plaintiffs allege that the KPNQwest Agreement required KPN to direct all new clients to KPNQwest rather than Infonet, thus prohibiting KPN from giving Infonet access to its customers. *See* Compl. ¶¶ 151, 154. The portion of the contract Plaintiffs quote in the Complaint contradicts their allegations. That portion of the KPNQwest Agreement provided:

> With regard to KPN's existing agreements with Unisource/AUCS, KPN shall not initiate any expansion of any activi-

ties that may conflict with the provisions of Article 12 [of this Agreement], except to the extent that it is obligated by contract (or otherwise[) ] to do so, provided, however, that KPN shall be entitled to engage in any activities that are reasonable to preserve the value of such existing investments, joint venture[s] or other arrangements.

Compl. ¶ 65.; *see also* Parry Decl., Ex. G. It is clear that this portion of the KPNQwest agreement allowed KPN to fulfill its contractual obligations with AUCS/Unisource, including the obligations set forth in the Agreements signed with Infonet, as those Agreements, entered into September 30, 1999, constituted "existing agreements with Unisource/AUCS." As Plaintiffs' own allegations demonstrate, KPN was not restricted from providing Infonet access to its clients. Accordingly, Plaintiffs' allegations fail to demonstrate that the Prospectus's failure to disclose the KPNQwest Agreement constitutes a material omission.[14]

Furthermore, Plaintiffs do not allege that KPN refused to "take all reasonable action to induce the Non–AT & T Custom-

---

**13.** Plaintiffs contend that in an August 7, 2001 conference call Defendants "admitted" that there were only 950 AUCS users at the time of the IPO. *See* Opp. at 14–15. This acknowledgment, at a later date, of the number of customers at the time of the IPO does not establish what Defendants knew at the time of the IPO. Although a later statement "may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement, . . . [i]t is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood." *In re Read–Rite*, 335 F.3d at 846 (quoting *Yourish v. Cal. Amplifier*, 191 F.3d 983, 996–97 (9th Cir.1999)).

**14.** It is doubtful whether Defendants could be held liable for omitting information regarding

the KPNQwest Agreement. The details of the Agreement were available to the public before Infonet's IPO in KPNQwest's F–1 Registration Statement filed with the SEC November 5, 1999. *See Wielgos v. Commonwealth Edison*, 892 F.2d 509, 517 (7th Cir.1989) (Section 11 does not require firm to reproduce publicly available information that is not firm-specific). Also, as the KPNQwest Agreement was likely not firm specific, Infonet did not have a duty to disclose non-firm specific information. *See Epstein v. Washington Energy Co.*, 1994 WL 561075 at *4 (W.D.Wash.1994), *affirmed by Epstein v. Washington Energy Co.*, 83 F.3d 1136 (9th Cir.1996) ("The term 'firm specific information' refers to the duty of a seller of securities to release material information about the corporation that is peculiarly within the knowledge of the corporation.").

ers to enter into contracts with Infonet" when requested by Infonet, as provided for in the Assignment Agreement. *See* Assignment Agreement, Parry Decl., Ex. F at 4. Nor do Plaintiffs allege that due to the KPNQwest Agreement, KPN refused to allow Infonet to market its services as provided for in the Stock Purchase Agreements. *See* Infonet Prospectus, Parry Decl., Ex. A at 55. Instead, Plaintiffs allege that an unidentified witness saw that "KPN was driving its customers to KPNQwest rather than Infonet and that he was seeing a lot of requests from distributors for information about whether there would be penalties for early termination of the end-suers' contracts with Infonet." Compl. ¶ 67. This allegation fails to satisfy the specificity requirements of Rule 9(b), because it neither identifies the witness nor explains how he was in a position to "see" KPN "drive its customers" to KPNQwest rather than Infonet. Moreover, nothing in the Prospectus suggested that KPN was required to send all its customers to Infonet for services; rather, the Prospectus represented that KPN would allow Infonet to market its services to KPN's clients and would recommend Infonet to those customers when Infonet requested KPN to do so. That Infonet failed to successfully market its services to KPN's clients, and that these clients purportedly wanted to terminate their contracts with Infonet raises no inference that KPN blocked Infonet's ability to market its services.[15] Accordingly, this allegation does not support Plaintiffs' argument that Defendants' failure to disclose the KPNQwest Agreement constituted a material omission.

#### iv. *AUCS Annual Revenue and Project Resolve*

■ Plaintiffs contend that the Prospectus was materially misleading because it failed to disclose various problems with AUCS's accounting methods and customer usage records, which Plaintiffs assert rendered AUCS's revenues misleading. *See* Opp. at 22–24. Specifically, Plaintiffs allege that a reasonable investor could not have evaluated the value of the AUCS transaction because the Prospectus did not disclose that AUCS had not completed its endeavor, known as "Project Resolve," to determine the number of AUCS's current customers and the services provided to these customers. *See* Compl. ¶¶ 36–37, 42–43, 93, 153. Plaintiffs also contend that the Prospectus was misleading because it failed to disclose that AUCS's revenues were not "earned" by invoicing its users, but instead were paid only once a year after a negotiation process with AUCS Owners. *See* Compl. ¶¶ 6, 9, 56–59, 61–62, 74, 91–92, 149, 155. Finally, Plaintiffs assert that such a system for calculating revenues violated Infonet's stated revenue recognition policy, a fact they claim should have been disclosed in the Prospectus. *See* Compl. ¶¶ 91, 143–45, 157. Plaintiffs assert that Defendants' failure to disclose this financial information violated various SEC Regulations.

As Plaintiffs recognize in the Complaint, Defendants were required to disclose detailed information concerning AUCS's financial statements in a manner conforming to generally accepted accounting procedures only if Infonet had acquired AUCS. *See, e.g.,* Compl. ¶ 45, 143.[16] There is no

---

**15.** Instead, the allegation describes a situation of which the Prospectus specifically warned, *viz.,* that "[s]ince the multinational clients have no obligation to use our services, we cannot assure you that all of the multinational clients will transition to our network,

[or] that the multinational clients which do transition to our network will continue to purchase our services[.]" Infonet Prospectus, Parry Decl., Ex. A at 56.

**16.** Plaintiffs also assert that the Prospectus violates SEC Rule 404, which is applicable

dispute that Infonet did not publicly portray the transaction as an acquisition. Nor do the Agreements, which governed the AUCS transaction, reflect that an acquisition occurred. *See* Parry Decl., Exs. C–F.

Plaintiffs assert, however, that Infonet "de facto" acquired AUCS. *See* Compl. ¶ 44–45. To support this proposition, Plaintiffs allege that Infonet entered into a Memorandum of Understanding ("MOU") with AUCS in April 1999, in which Infonet stated its intent to purchase AUCS's business and assets. Compl. ¶ 39. However, an MOU, or letter of intent, is not usually a binding contract, but is "a mutual commitment to negotiate together in good faith in an effort to reach a final agreement within the scope that has been settled in the preliminary agreement." *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir.1989) (quotation omitted). Plaintiffs do not allege that the Infonet/AUCS MOU was anything more than a non-binding preliminary agreement.

Plaintiffs also assert that Infonet "de facto" acquired AUCS because Infonet allegedly acquired AUCS assets. *See* Opp. at 7. However, the Complaint does not allege that Infonet purchased AUCS assets; rather, it alleges only that Infonet purchased from a third party assets that AUCS had been leasing from that third party. *See* Compl. ¶ 90. As such, the Complaint fails to allege that Infonet purchased any AUCS assets.

The remainder of Plaintiffs allegations regarding the "de facto" purchase are conclusory or are attributable to unspecified sources and unnamed witnesses. *See, e.g.,* Compl. ¶ 48–49.[17] Plaintiffs assert in a conclusory manner that various attributes of the AUCS were integrated into Infonet, such as AUCS's physical facilities in Hoofdorf, Netherlands, AUCS's market distribution, AUCS's customer base, and the operating rights of AUCS's network. *See* Compl. ¶ 48. Plaintiffs also allege that AUCS's employees "came under the supervision and control of Infonet." *Id.* However, Plaintiffs cite no basis for such information. Moreover, even were these allegations taken as true, such actions are not inconsistent with a hands-on management relationship, as described in the AUCS Agreements.[18]

As Plaintiffs here fail to allege that Infonet acquired AUCS, the court need not consider whether Defendants were required to disclose every underlying prob-

---

regardless of whether Infonet acquired AUCS. *See* Opp. at 24; *see also* Compl. ¶ 45. Rule 404 requires a registrant of securities to describe any transaction, or series of similar transactions, since the beginning of the registrant's last fiscal year or any currently proposed transactions with a security holder who is known to the registrant to own five percent of any class of the registrant's voting securities. *See* 17 C.F.R. § 229.404. Plaintiffs' allegations are groundless, as the Prospectus provided a detailed description of KPN, Swisscom, and Telia's involvement in the AUCS transaction. *See, e.g.,* Infonet Prospectus, Parry Decl., Ex. A at 66.

17. For instance, Plaintiffs allege that an unnamed witness, "who was a key executive secretary at Infonet," stated that Jose Collazo was instructed by Infonet's Vice–President not to use the word "merger" or "acquisition" to describe the AUCS transaction, but rather to use the term "management agreement." Compl. ¶ 49. Plaintiffs assert no details regarding when such statements were made. Nor does such a statement create an inference of fraud.

18. Notably, Plaintiffs do not allege that Infonet exceeded its managerial authority as granted in the Agreements. Any potential investor was on notice of the scope of the Infonet's managerial relationship with AUCS, as the Agreements governing the relationship were attached to the Prospectus and Registration Statement filed with the SEC. *See* Parry Decl. Exs. C–F.

lem that might have contributed to AUCS's troubles, such AUCS's inability to accurately monitor customer usage and its year-end revenue negotiation process— problems which "Project Resolve" was meant to address. Plaintiffs' failure to allege that Infonet acquired AUCS eliminates Plaintiffs' ability to rely on Defendants' failure to submit AUCS's financial reports with its Registration Statement to establish a claim under Section 11. *See* Opp. at 24 (citing *Steckman v. Hart Brewing*, 143 F.3d 1293, 1296 (9th Cir.1998)).

In sum, Plaintiffs have failed to allege material misrepresentations made by Defendants in conjunction with the IPO. Accordingly, the court GRANTS Defendants' motion to dismiss the Section 11 claim.

### c. *Section 12 Claim*

 Section 12(a)(2) of the Securities Act establishes liability for persons who offer or sell securities by means of communications that include untrue or misleading statements or omissions. *See* 15 U.S.C. § 77*l*(a)(2). A plaintiff must establish that he or she purchased shares directly in the offering pursuant to the prospectus alleged to be misleading. *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 535 (9th Cir.1989). In *Pinter v. Dahl*, 486 U.S. 622, 647–48, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), the Supreme Court held that a person may be liable under the predecessor of § 12(a)(1) if the person either: (1) passes title to the securities to the plaintiff, or (2) solicits the purchase, motivated in part by his own financial interests. The

Ninth Circuit has held that this rule applies to the predecessor of § 12(a)(2). *See Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 536 (9th Cir.1989).

Defendants assert that they are not persons who offered or sold the securities within the meaning of § 12(a)(2), because the shares were sold to the public through a firm commitment underwriting. *See* Mot. at 25. A firm commitment underwriting is one in which the underwriter agrees to buy all the shares to be issued and remains financially responsible for any securities not purchased. *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1215 (1st Cir.1996), *superseded by statute as stated in Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir.1999). Thus, the issuer and its directors and officers do not pass title to persons who buy in firm commitment underwriting; instead, title is passed to buyers by the underwriters. *See id.* As Infonet and the Individual Defendants did not pass title to the securities to Plaintiffs, Defendants' cannot be held liable under the first prong of *Pinter*.

The Individual Defendants may still be liable under § 12(a)(2) under the second prong of *Pinter* if they solicited the sale of the securities.[19] As explained in *In re Stratosphere Corp. Sec. Litig.*, 1 F.Supp.2d 1096 (D.Nev.1998), "[i]n a firm commitment offering, the officers of the company issuing the registration statement may not be held liable as 'sellers' under [Section 12] unless they actively solicited the Plaintiffs'

---

**19.** Plaintiffs mistakenly assert that Defendants conceded Infonet's liability with regard to the § 12(a)(2) claim. However, Defendants' brief clearly argued that Infonet could not be held liable under § 12(a)(2) because the Infonet IPO was a firm commitment. *See* Mot. at 25. Although Infonet could be liable under § 12(a)(2) under the theory of respondeat superior for the alleged actions of Defendants Collazo and Firdosy, the Complaint is devoid

of allegations that these Defendants acted within the course and scope of their employment with Infonet when they made the alleged misrepresentations. *See In re Musicmaker.com Sec. Litig.*, 2001 WL 34062431 at *14 (C.D.Cal. June 4, 2001) (Snyder, J.) (issuer can be liable under § 12(a)(2) for officers' statements under respondeat superior theory).

purchase of securities to further their own financial motives[.]" *Id.* at 1120.

Plaintiffs assert that the Individual Defendants "solicited the sale of securities" under § 12(a)(2) because they were officers of Infonet at the time of the IPO and signed the Registration Statement and Prospectus. *See* Opp. at 26. This issue has not been decided by the Ninth Circuit. Courts that have addressed the issue are divided. Some district courts have held that § 12(a)(2) extends liability to officers and directors who sign the Prospectus and Registration. *See, e.g., In re Proxima Corp. Sec. Litig.,* 1994 WL 374306 at *5 (S.D.Cal. May 3, 1994); *Keegan Mgt. Co. Sec. Litig.,* 1991 WL 253003 at * 8 (N.D.Cal.1991). These courts have reasoned that "[t]o one who studies corporate filings and news releases before purchasing via a deal or an impersonal and anonymous market, the corporation [and] its officers and directors ... appear to be the true 'sellers,' and are thus liable under § 12(a)(2)." *Keegan Mgt. Co.,* 1991 WL 253003 at * 8.

However, the court finds persuasive the reasoning of *In re Stratosphere Corp. Sec. Litig.,* 1 F.Supp.2d 1096 (D.Nev.1998), which held that "merely proving that [the officers and directors] signed the allegedly misleading registration statement or prospectus for a firm commitment offering is insufficient to prove that Defendants were sellers under section 12." *Id.* at 1120. The *In re Stratosphere* court reasoned that an individual's "simple involvement" in the preparation of a registration statement is insufficient to establish the sort of relationship between a buyer and seller required to establish liability under § 12(a)(2). *Id.* at 1121; *see also In re Musicmaker.com Sec. Litig.,* 2001 WL 34062431 at *14 n. 9 (C.D.Cal. June 4, 2001) (Snyder, J.) (same); Thomas Lee Hazen, *Treatise on the Laws of Securities Regulation* § 7.2 at

579 (4th Ed.2002) ("Even substantial involvement in the preparation of registration and offering materials will not create liability unless there is also active involvement in the negotiations leading to the sale in question.").

Moreover, the Supreme Court noted in *Pinter* that "Section 11(a) explicitly enumerates the various categories of persons involved in the registration process who are subject to suit under that section, including many who are participants in the activities leading up to the sale. There are no similar provisions in § 12, and therefore we may conclude that Congress did not intend such persons to be defendants in § 12 actions." *Pinter,* 486 U.S. at 650 n. 26, 108 S.Ct. 2063. The categories of persons liable under § 11 include: "(1) every person who signed the registration statement; (2) every person who was a director of (or a person performing a similar function) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted[.]" 15 U.S.C. § 77k(a). Under *Pinter,* the Individual Defendants, who were officers or directors at the time of the IPO and signed the registration statement, are already potentially liable under § 11. As such, they cannot be liable under § 12(a)(2) merely because they were officers or directors or because they signed the Prospectus and Registration Statements. Instead, Plaintiffs must allege that they "actively 'solicited' the Plaintiffs' purchase of securities to further their own financial motives[.]" *Shaw,* 82 F.3d at 1215.

Under this standard, Plaintiffs fail to state a § 12(a)(2) claim against Defendants Campbell, De Jong, Ekberg, Kojima, Nancoz, and Sagrario, as their only alleged acts were serving on the Board of Directors and signing the Prospectus and Registration Statement. *See, e.g.,* Compl.

¶ 183. Such activities do not constitute active solicitation of Plaintiffs' purchase of Infonet stock. *See Worlds of Wonder*, 694 F.Supp. at 1435 ("[P]laintiffs must allege facts which demonstrate that defendants 'solicited' the purchase of securities at issue.").

Plaintiffs do allege, however, that Defendants Collazo and Firdosy made oral misrepresentations during various roadshow presentations. *See* Compl. ¶ 52. As discussed previously, however, these alleged misrepresentations are protected by the bespeaks caution doctrine. *See* discussion *supra* at 1091–93. Even were the bespeaks caution doctrine inapplicable, Plaintiffs do not allege that Defendants Firdosy or Collazo personally or directly solicited any of the named Plaintiffs. *See Shain v. Duff & Phelps Credit Rating Co.*, 915 F.Supp. 575, 581 (S.D.N.Y.1996) (quoting *In re Newbridge Networks Sec. Litig.*, 767 F.Supp. 275, 281 (D.D.C.1991) (Defendants cannot be statutory sellers for purposes of § 12 "absent any allegations of direct contact of any kind between defendants and plaintiff-purchasers[.]")). Moreover, Plaintiffs allegations concerning Defendants Collazo and Firdosy do not meet Rule 9(b)'s pleading requirements, as they do not adequately specify when and where Defendants made the allegedly misleading statements. *See* Compl. ¶ 52 (stating that Defendants Collazo and Firdosy made misstatement during roadshow presentations "during November and December 1999" in various cities including Boston, New York, Chicago, and Los Angeles). Accordingly, for these reasons, the court GRANTS Defendants' motion to dismiss the § 12(a)(2) claim.

### 3. Securities Exchange Act Claims

#### a. *Pleading Standard for Rule 10(b)*

To state a claim for securities fraud under Section 10(b), the plaintiffs must allege: "(1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which [the claimants] relied (5) which proximately caused [their] injury." *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir.2002) (citing *McCormick v. Fund American Cos.*, 26 F.3d 869, 875 (9th Cir.1994)). Furthermore, to state a claim under Section 10(b), the plaintiffs must meet the pleading requirements of Rule 9(b). *See Yourish v. California Amplifier*, 191 F.3d 983, 993 (9th Cir.1999). As explained previously, Rule 9 requires plaintiffs to state with particularity the circumstances constituting fraud.

The Private Securities Litigation Reform Act ("PSLRA") modified Rule 9(b) to require that any complaint in a securities action "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). These requirements "are not satisfied merely by making the complaint long. . . . [T]he pleading has to state particularized facts that, taken as a whole, raise a strong inference that defendants intentionally or with deliberate recklessness" committed the alleged securities fraud. *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir.2001). The factual allegations must not only be particular, but also must "strongly imply [the defendant's] *contemporaneous* knowledge that the statement was false when made." *In re Read–Rite*, 335 F.3d 843, 847 (9th Cir. 2003).

Typically in a motion to dismiss, the court must accept plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *See Silicon Graphics*, 183 F.3d at 983. Under the PSLRA, however, the court is to review

the complaint in its entirely to determine whether the totality of the facts and inferences demonstrates a strong inference of scienter. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir.2002). In so doing, the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs. *Id.* Such an approach is consistent with Congress's intent in passing the PSLRA, *viz.*, "to eliminate abusive and opportunistic securities litigation and to put an end to the practice of pleading fraud by hindsight." *Id.* at 897; *see also* Thomas Hazen, *The Law of Securities Regulation* § 3.9[6] at 279 ("[T]he essence of liability for materially misleading projections is not that the prediction did not prove accurate but rather that the investor has been misled as to the reliability of the projections.").

b. *Allegations Relevant to Section 10(b)*

■ Plaintiffs' § 10(b) claim is based on the same allegations as their §§ 11 & 12 claims. *See* Compl. ¶ 186. As the PSLRA's pleading requirements for § 10(b) claims significantly exceed those for §§ 11 and 12 claims, Plaintiffs' failure to plead material misstatements or omissions in their §§ 11 and 12 claims compels the conclusion that they have failed to state a claim under § 10(b). *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir.2002) (PSLRA's requirement that a complaint plead with particularity both falsity and scienter creates stricter pleading standards for § 10(b) claims than for § 11 or § 12 claims). Therefore, insofar as Plaintiff § 10(b) claim involves alleged misrepresentations by Defendants in connection with the IPO, the court GRANTS Defendants motion to dismiss. *See* discussion *supra* at 1094–1103. The court next addresses Plaintiffs' allegations concerning alleged post-IPO misrepresentations.

c. *Safe Harbor Provision*

■ The PSLRA's "safe harbor" provision amended the Securities Act, *see* 15 U.S.C. § 77z–2, and the Securities Exchange Act, *see* 15 U.S.C. § 78u–5.[20] Similar to the judicially-created "bespeaks caution" doctrine, these sections provide protection to "forward-looking statements." The safe harbor provision provides that a forward-looking statement cannot be the basis of liability under the Securities Act or the Securities Exchange Act if: (1) the statement is identified as forward-looking and is accompanied by sufficient cautionary statements, 15 U.S.C. § 78u–5(c)(1)(A); or (2) the person who made the forward-looking statement did so without actual knowledge that the statement was false or misleading, 15 U.S.C. § 78u–5(c)(1)(B).[21] The PSLRA provides that forward-looking statements may in-

---

**20.** Unlike the "bespeaks caution" doctrine, the PSLRA's safe harbor does not apply to statements made "in connection with" an IPO. *See* 15 U.S.C. § 78u–5(b)(2)(D).

**21.** Plaintiffs assert that the safe harbor provision protects forward-looking statements only if accompanied by meaningful cautionary statements. Plaintiffs ignore the second prong of the safe harbor provision, *viz.*, that forward-looking statements are also protected if a plaintiff fails to establish that the person making the statement had actual knowledge that the statement was false or misleading. *See* Opp. at 41. This is not the first time

Plaintiffs' counsel have advanced this interpretation of the safe harbor provision; indeed, it appears to be a trend equaled only by uniform rejection of this reading by various district courts in this circuit. *See, e.g., In re Seebeyond Technologies*, 266 F.Supp.2d 1150, 1162–66 (C.D.Cal.2003) (Pregerson, J.); *In re Lockheed Martin Corp. Sec. Litig.*, 272 F.Supp.2d 944, 949–50 (C.D.Cal.2003) (Pfaelzer, J.); *In re Splash Technology*, 160 F.Supp.2d 1059 (N.D.Cal.2001) (Armstrong, J.); *In re Boeing Sec. Litig.*, 40 F.Supp.2d 1160, 1167 (W.D.Wash.1998) (Zilly, J.).

clude statements regarding projections of revenues, the plans and objectives of management, and future economic performance. *See* 15 U.S.C. § 78u–5(i)(1). The safe harbor protects both written and oral forward-looking statements. *See* 15 U.S.C. § 78u–5(c)(1)–(2).

Defendant Collazo is the only Defendant alleged to have made any statements after the IPO. *See* Compl. ¶¶ 99, 100, 102, 104, 106, 110, 111, 114, 117. As Defendants assert, many of these statements are forward-looking statements, as they concerned Infonet's future financial condition and potential revenues. For instance, Plaintiffs allege that during a February 10, 2000 conference call, Collazo allegedly predicted: (1) migration of 165 AUCS users by September 2000 and 320 by March 2001; (2) AUCS revenues for 2001 and 2002 would be $275 million and $373 million respectively; and (3) Infonet revenues for 2001 and 2002 would be $765 million and $1 billion respectively. Compl. ¶ 99. Similarly, on March 23, 2000, Collazo made an "upbeat presentation" in West Palm Beach, Florida, during which he allegedly "outlined bullish growth plans for the company." *Id.* ¶ 100. Some of Collazo's forward-looking statements were contained in press releases or analysts' reports, such as a June 12, 2000 press release in which Defendant Collazo stated that "we are comfortable with our estimate of $780 million in revenues for FY 2001." *Id.* ¶ 105.

Defendants argue that Collazo's forward-looking statements are protected by the second prong of the safe harbor provision, because Plaintiffs did not adequately allege that Defendant Collazo made these statements with actual knowledge that they were false or misleading. *See* Mot. at 29–32; Reply at 17–18. In their Opposi-

tion, Plaintiffs fail even to address Defendants' argument. After reviewing the Complaint, it is evident why, as throughout the 30 pages of allegations describing Collazo's allegedly misleading statements regarding Infonet's future revenue, Plaintiffs fail to make a single allegation regarding his particularized knowledge. Instead, Plaintiffs allege generally that "Defendants" (without specifying among the 21 named Defendants in this action) knew various alleged facts, and therefore, knew that the forward-looking statements were actually false. Such generic allegations cannot support an inference, let alone a strong inference as required by the PSLRA, that Defendant Collazo had actual knowledge at the time he made the various forward-looking statements that they were false. *See In re Splash Tech. Holdings Sec. Litig.*, 160 F.Supp.2d at 1069 (To the extent a plaintiff relies upon allegations of false forward-looking statements, he must plead "in great detail," "all the facts" forming the basis for the belief that the defendant made the statements with actual knowledge they were false.). Accordingly, the court GRANTS Defendants motion to dismiss the § 10(b) claim insofar as it relies on Defendant Collazo's post-IPO forward-looking statements.[22]

#### d. *Scienter*

■ Defendants contend that Plaintiffs fail to allege scienter as required by Section 10(b). *See* Mot. at 28. The PSLRA requires securities fraud claimants to plead with particularity that the accused party acted with scienter. The Supreme Court has defined "scienter" in the Section 10(b) context as "a mental state embracing the intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 n. 12, 96 S.Ct. 1375, 47

---

**22.** Defendants also contend that the first prong of the safe harbor protects Defendant Collazo's forward-looking statements because they were adequately designated as forward-

looking and were accompanied by sufficient cautionary language. As the second prong of the safe harbor applies, the court need not address this argument.

L.Ed.2d 668 (1976). The scope of Section 10(b) also applies to "reckless" behavior, which has been defined by the Ninth Circuit as "a highly unreasonable omission, involving not merely simple, or excusable negligence, but an extreme departure from the standards of ordinary care[.]" *DSAM Global Value Fund,* 288 F.3d at 389 (quoting *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1569 (9th Cir.1990)). Thus, to state a claim under Section 10(b), a claimant is required to "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 974 (9th Cir.1999).

Plaintiffs' § 10(b) claim is against all 21 named Defendants. *See* Compl. at 98. Throughout the Complaint, however, Plaintiffs make little effort to distinguish each Defendant's individual knowledge of the facts and circumstances surrounding the alleged misstatements. For instance, Plaintiffs' only allegations against Defendants De Jong, Ekberg, Kojima, Nancoz, Sagrario, and Campbell are that they signed the Prospectus and Registration Statement. *See* Compl. ¶¶ 26, 56. Yet, the Complaint does not differentiate their knowledge and participation from that of Defendants Collazo and Firdosy, who allegedly were more involved with Infonet's relations with analysts and investors. *See, e.g.,* Compl. ¶ 94 ("Defendants knew that representations concerning the AUCS transaction were false."); *id.* ¶ 187 ("[D]uring the class period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading.").

Similarly, Plaintiffs rely on alleged misstatements in various analyst reports. *See* Compl. ¶¶ 101, 103, 105, 107, 112, 113, 115, 116. Plaintiffs assert only boilerplate allegations that Defendants Collazo and Firdosy were somehow involved in their preparation. *See, e.g.,* Compl. ¶ 113 (ABN AMRO issued report on Infonet "after discussions with Collazo and Firdosy"); *id.* ¶ 115 (same); *id.* ¶ 116 (Lehman Brothers issued report on Infonet "after discussions with Collazo and Firdosy"); *id.* ¶ 118 (same). Not only do Plaintiffs' fail to plead with particularity Defendants Collazo and Firdosy's involvement in the preparation of the analysts' reports, they fail to adequately allege that Defendants Collazo and Firdosy made the alleged misstatements knowingly or with deliberate recklessness.[23] Because Plaintiffs have failed to plead allegations that create a strong inference that any Individual Defendant acted with scienter, the court GRANTS Defendants' motion to dismiss Plaintiffs' § 10(b) claim.[24]

## V. CONCLUSION

For the foregoing reasons, the court GRANTS Defendants' motion to dismiss.

---

**23.** Plaintiffs also fail to adequately allege that Defendants can be held liable for statements made in the analysts' reports. To be held liable for analysts' reports, a defendant must have either: (1) made false or misleading statements to analysts with the intent that the analysts would communicate those statements to the market; or (2) put his or her imprimatur on the analysts' statements. *See Osher v. JNI Corp.,* 256 F.Supp.2d 1144, 1154–55 (S.D.Cal.2003). Plaintiffs' cursory assertions concerning Defendants' Collazo and Firdosy's involvement in the preparation of the analysts' reports, coupled with lengthy block quotations, fall far short of alleging adequate involvement to satisfy the pleading requirements of the PSLRA. *See id.* ("Plaintiffs do not identify the substance of the false or misleading statements or plead any corroborating details indicating how, when, and under what circumstances the statements were communicated to the analysts.").

**24.** Because Plaintiffs have failed to plead an underlying securities law violation, Plaintiffs' control person claims under § 15 of the Securities Act and § 20(a) of the Securities Exchange Act must be dismissed. *See Paracor Finance, Inc. v. General Elec. Capital Corp.,* 96 F.3d 1151, 1161 (9th Cir.1996).

As Plaintiffs could cure some of the deficiencies outlined in this order, the court grants Plaintiffs leave to amend the Complaint. Any amended complaint shall be filed no later than September 2, 2003.

IT IS SO ORDERED.